(12 Misc. Rep. 600.)

### ADAMSON v. NASSAU ELECTRIC R. CO. et al.

(Supreme Court, Special Term, Kings County. May 6, 1895.)

1. MUNICIPAL CORPORATIONS—ACTION BY TAXPAYER.

If a city council, in bad faith, and as a matter of favoritism, grants franchises to a person for less than could be obtained from another, such act is within Laws 1892, c. 301, authorizing taxpayers to sue city officers to prevent waste of city property.

2. SAME—WASTE BY CITY OFFICERS—EVIDENCE.

Where a city council granted franchises for a part only of the compensation which it was authorized to exact, without any endeavor to secure greater, and without giving any opportunity to competitors to bid therefor, a prima facie case of waste of municipal property is made.

3. SAME—ILLEGAL GRANT OF FRANCHISE.

In an action by a taxpayer to have certain franchises granted by a city declared void, it appeared that their grant was secured by the same aldermen who had previously attempted to grant substantially the same franchises to defendant corporations gratuitously, though others offered large sums therefor; that the reasons assigned by the aldermen for granting the franchises in controversy were not made in good faith, and were not based upon existing facts which the aldermen knew; that competing companies made bids, and averred their willingness to increase them and meet conditions imposed, and defendant corporations made no bids whatever; that the council on one occasion adjourned to avoid the consideration of a competitor's petition, and on another the appropriate committee recommended the grant of the franchises to defendant corporations without inspecting a competitor's petition; that, when the committee determined upon the percentage plan of compensation, that fact was not brought to the notice of the competitors, and they were allowed to believe that bids were to be made in a lump sum; that the consents themselves were so constructed that by their terms the city could be made to accept a nominal compensation for the franchises. *Held*, that the franchises were granted to defendant corporations in bad faith, and as a matter of favoritism, and were therefore void.

Action by John Adamson against the Nassau Electric Railroad Company and others to have declared void certain franchises granted to defendant corporations by the common council of Brooklyn. Judgment for plaintiff.

Edward M. Grout, and Jesse Johnson, for plaintiff.

James C. Church, Samuel B. Clarke, Elihu Root, and John J. Allen, for defendant companies.

Alfred E. Mudge, for defendant city of Brooklyn.

Foster L. Backus, for defendant board of aldermen.

SMITH, J. Upon the 19th day of June, 1893, the common council of the city of Brooklyn passed a resolution purporting to grant to the Nassau Electric Railroad Company the right to construct and operate an electric road upon certain streets in the city of Brooklyn. Upon the same day the said council passed a resolution purporting to grant to the Kings County Electric Railway Company the right to construct and operate an electric road upon certain other streets in the city of Brooklyn. Upon the same day the said council passed a resolution purporting to grant to the Brooklyn City Railroad Company the right to construct and operate an electric road upon certain other streets in the city of Brooklyn. Upon the 23d day of June

these resolutions were approved by the mayor of said city. . This action is brought by the plaintiff, a taxpayer in said city, to have declared void the franchises thus granted to the Nassau Electric Railroad Company and the Kings County Electric Railway Company, on the ground that the same were fraudulently granted and constitute a waste of the city's property.

In the case of Adamson v. Railroad Co. (reported in general term), in 74 Hun, at page 3, 26 N. Y. Supp. 136, the law has been declared in this department to be that where the common council grants to a railroad company, for nothing, a franchise for which the city is offered a substantial sum of money by another railroad company, and where such action is in bad faith, and as a matter of favor to the company receiving the grant, such action amounts to a waste of the public funds of the municipality, and is within the condemnation of the statute [1] under which this action is brought. This decision, whether right or wrong, must control my decision in any case which involves the principle decided. It must follow, as a corollary to the proposition decided, that if the council, in bad faith, and as a matter of favoritism, grants to a railroad company a franchise for a less sum than could be obtained from a competing company, such an act is also within the condemnation of the statute, and this action will lie to declare the same void. Two propositions of fact then remain to be established by the plaintiff to entitle him to the decree of the court: (1) That the franchises were granted for a less sum than could be obtained from a competing company; (2) that such franchises were given in bad faith, and as matter of favoritism to the defendant companies.

1. The provision for compensation contained in the grants, both to the Nassau and to the Kings County Companies, requires the companies to pay into the treasury of the city 1 per cent. of the gross earnings, until the gross earnings shall amount to the sum of $20,000 per mile; thereafter 2 per cent. until the gross earnings shall amount to the sum of $40,000 per mile; thereafter, 3 per cent. upon the said amount of gross earnings. Some question is raised as to whether these consents are to be construed as referring to a mile of single track, or double track. I cannot see that the question has any material bearing until the company shall earn at least $40,000 per mile of double track, in which case the construction of the statute would determine whether the company was to pay 3 or 4 per cent. upon its gross earnings. Nor is it necessary to determine whether, under the statute, the franchises could have been sold at auction, or granted for a lump sum instead of for the percentage compensation. Under the statute the common council clearly had the right to exact the full 3 per cent. on all the gross earnings received. They did not exact the limit of compensation within the law. The Union Street-Railway Company had offered over $250,-000 for these franchises granted to the defendant companies. For

[1] The statute referred to in the opinion is Laws 1892, c. 301, providing that any taxpayer whose assessment shall amount to $1,000 may maintain an action against municipal officers to prevent waste, or to make good any property, funds, or estate of the city.

some portions of the streets granted by these consents, they had offered the sum of $20,000 per mile. The Brooklyn City Railroad Company had offered $150,000 for substantially the same privileges. Both in their written communication to the council, and at the public meetings of the committee, upon June 9th, the Union Street-Railway Company had, through its attorneys, requested, if other companies should bid higher, that such fact might be made known to them, that they might raise their bid, if they were so advised. The Brooklyn City Railroad Company had made a similar request in its petition to the common council. The Union Street-Railway Company had further requested, if any other form of compensation was to be called for, that the terms and conditions might be given to them, that they might bid thereupon. The compensation exacted was so exacted, not upon any bid by any company. There was no effort made to ascertain whether the defendant companies themselves were not willing to pay more for the franchises. No opportunity was given, either to the Union Street-Railway Company or the Brooklyn City Railroad Company, to bid therefor upon the percentage system. It is impossible to ascertain, to any degree of accuracy, what would be the profits to the city under the system adopted. When, however, the common council granted these franchises, for a part only of the compensation which it was authorized to exact, to two electric companies, who had made no offers whatever, without any endeavor on the part of the council to secure a greater compensation, and without any opportunity to two competing companies to bid therefor, who were asking these franchises, and asking an opportunity to bid, then, in my judgment, a prima facie case of waste is made. The trustees must then assume the burden of showing that they have secured for their cestuis que trustent a fair value for the franchises. This burden they have not assumed, and have not met. I must therefore find, both upon the facts and the presumptions, that the compensation that was exacted was less than could have been procured for the said franchises.

2. Was such action in bad faith, and as a matter of favoritism to the defendant companies? There was no requirement of law that the council should exact anything for these franchises. They could have given them away, provided their action was in good faith, and, as they supposed, for the best interests of the city. It is only when waste or injury to the funds of the city is the result of bad faith and favoritism that this action is authorized. The consents are regular upon their face. Some compensation is exacted. Fraud must be proved. The presumption of good faith always attaches to an act of a public officer. We must look, then, behind the grants of the franchises, and ascertain whether they were in fact given by the members of the board in the honest fulfillment of their trust, and for what they supposed to be the best interests of the city. In examining this question, it is proper to inquire what relations, if any, existed between the members of the board whose actions are questioned and the defendant companies. It appears from the evidence that in 1892, by the voice of the same 13 members of the council who voted for the franchises here in suit, with one excep-

tion, valuable franchises were given, without compensation, to the Union Railroad Company and the Coney Island, Ft. Hamilton & Brooklyn Railroad Company. In both of these companies, Mr. Flynn, who is the president of the defendant companies, was largely interested. It appears that in the Union Railroad Company he owned a large part, if not a majority, of the stock. The gifts of the city franchises at that time were made in the face of an offer by the Union Street-Railway Company of $30,000 therefor, which offer was entirely ignored. In April, 1893, the same 13 aldermen who voted for the franchises here attacked, with one exception, passed resolutions purporting to grant to these defendant companies, without any compensation whatever, substantially the same franchises which are here granted. This was done in the face of an offer from the Brooklyn City Railroad Company of $150,000 for the very franchises which these aldermen sought to give away to these defendant companies. Both of these attempted gifts miscarried. They are properly considered, however, when we find these same aldermen passing a resolution purporting to grant to these defendant companies these valuable franchises for a part only of the compensation which they were authorized to exact, without endeavor on their part to obtain a larger compensation therefor, and refusing an opportunity to rival companies to make any bids thereupon. I am not unmindful of that part of the mayor's message of April 17th to the council in which it is asserted that, by current rumor, the resolutions of April 10th, by which these gifts were made to the defendant companies, were passed upon the assumption that the mayor had the power to regulate the compensation. There is no proof in the case which gives me any reason to believe that such was in fact the understanding of the board. These 13 aldermen by whose votes this grant is assumed to have been given have stated fully their reasons for the gift. One of those reasons is, as appears in the report of the railroad committee upon the application of the Union Street-Railway Company, that there is a grave doubt as to the power of the Union Street-Railway Company to extend its route prior to the construction of its originally proposed road. Justice Cullen, in the suit of Adamson v. Railroad Co., had just decided that such an extension was lawful. The chairman of the railroad committee had, in the presence of others on the committee, put this question to the corporation counsel, whose answer was that, if compelled to answer it without examination, he should have to say no, but that it was a question upon which he should like to make examination. They did not wait, however, for an examination by the corporation counsel. After the question had been fairly decided by the court, the assignment of a doubt thereupon as a reason for their action could not have been made in good faith. It is evidently a pretext, and not a reason.

Another reason assigned was that the extensions proposed by the Union Street-Railway Company were separated in several instances, not only from each other, but also from the remaining routes of the Union Street-Railway Company, so that, if built upon, they would form either distinct routes, or entirely disconnected routes

from the main routes of the company. If the amended petition of the Union Street-Railway Company of May 22d were the only information possessed by this committee as to the extensions proposed, the reasons would have been good. But upon the 12th day of June, a week before the report of this committee, there was handed to the president of the council another petition of the Union Street-Railway Company, wherein the streets upon which offers were made were not disconnected from the main line, or from each other. The learned counsel for the defendants argues that that amended petition was considered by the committee in making its report. If so, this reason assigned was not assigned in good faith; it was a pretext, and not a reason.

Another reason assigned is that better facilities to the traveling public would be offered by the grants to the defendant companies. The Coney Island, Ft. Hamilton & Brooklyn Railroad Company and the defendant companies were associated together, and were to be run in connection with each other. These companies had the consents of outlying towns through which they proposed to construct their roads. It was thus argued that the proposition of the defendant companies presented more of substantial benefit to the public at large than did the proposition of the Union Street-Railway Company. This reason is sufficient, if made in good faith. Was it so made? Nothing whatever is said in the reports of this committee about the proposition submitted by the Brooklyn City Railroad Company. That company had made application for substantially these same franchises, and had made an offer of $150,000 therefor. That company had already constructed in the city of Brooklyn, and in outlying towns, over 180 miles of railroad. Applications were then pending for consents for the construction of 80 miles further in outlying towns, which applications were afterwards granted. The Brooklyn City Railroad Company not only made this cash offer, but requested an opportunity to make further bids for that franchise. If the reason assigned be a good reason for preferring the defendant companies to the Union Street-Railway Company, it certainly can constitute no reason for preferring the defendant companies to the Brooklyn City Railroad Company. Every advantage thus gained would be substantially increased by giving these grants to the Brooklyn City Railroad Company, by reason of its extended railroad already built in and out of the city of Brooklyn. It is true that upon the 19th day of June the Brooklyn City Railroad Company was given certain franchises. But what they were given constituted a very small part of what they were asking for, and asking to bid upon, and constituted no part of what was desired by the defendant companies. But, again, were the reasons assigned made in good faith, as against the application of the Union Street-Railway Company? It developed upon the trial that this company had a small capital. They had made application, however, to increase their capital stock. Of this fact the board of aldermen were notified by the amended petition submitted upon June 12th. They requested that if there was any objection to their application, by reason of any defects of form or substance that were

curable, they be made aware of that fact, that they might cure the same. Suppose a private trustee, with property of great value for sale, were requested by different persons to be allowed to bid thereon. Could he ignore their offers, and sell the property for a small sum to a friend, by reason of the mere assertion of the fact that he questioned their good faith? Any assumed doubt as to the good faith of the application of the Union Street-Railway Company is not a substantial reason for the rejection of their offer. That doubt could have been easily removed by tests which they were authorized to make in the making of conditions upon which such bids should be made. The council could have said to them: "We doubt the good faith of your application. Prove it to us by increasing your capital stock, and extending your route to include these outlying towns, and you may then bid for these franchises." In the Adamson Case, cited, Justice Cullen, in his opinion, says, "I deny the power of the common council to arbitrarily reject applications on the ground of doubts as to the good faith of the applicants, without making an investigation on the subject." This company was before the board and its committee, asserting its good faith, and offering any vouchers that should be asked. But none were asked. The board did not care to have the proof made.

Having examined the relations of the parties, and found that they were such as to cast suspicion upon this grant, and having examined the reasons assigned for their action, and having found that some, if not all, of those reasons were not made in good faith, let us look a little further, and see if there is any other fact to aid us in the solution of this problem. Going back to the petitions presented, we find in the petition of the Union Street-Railway Company specific offers of compensation for those franchises. In the petition of neither of the defendant companies was there any offer whatever of compensation. The question occurs to one, at the outset, how did these companies dare to make an application without an offer, after the decision in the case of Adamson v. Railroad Co.? They must have known their men. After the petitions were presented, came then the public hearing before the committee of railroads, upon June 9th. There stood the attorneys for the Union Street-Railway Company, making bids and increasing their own bids, and asking to be allowed to know upon what conditions they were to bid, and still the defendant companies made no bid whatever. They still were not apprehensive of the result. Upon the request of the attorney for the Union Street-Railway Company to be made acquainted with the manner of the bidding, he was informed by the chairman of the committee that they were not there for that purpose. For what purpose were they there? They were trustees of the taxpayers of the city of Brooklyn, charged by their trust to make most profitable to those taxpayers the disposition of this valuable property. They refused to give any terms of sale, that willing bidders might make bids thereon. Private trustees have suffered the severest censure of the court for acts less flagrant. The attorneys for the Union Street-Railway Company requested that if there be objection to their

bid, by reason of any defect which was curable, they might be notified thereof, that they might cure such defects, and make a bid that would be acceptable to the committee and to the board. They were informed by the chairman of the railroad committee that they were not there for the purpose of detecting defects in their application; that that was their lookout. Certainly, this committee, with the aid of the learned counsel, has made a most careful study since that time to detect such defects. They did not, however, notify the attorneys of the competing companies, so that the defects might be cured. Yet the defendants claim that here were honest trustees, fulfilling the purposes of their trust in a faithful, conscientious manner. Come then to the meeting of June 12th. Mr. Grout, in behalf of the Union Street-Railway Company, presented to the president of the board its amended petition. Upon undisputed evidence, nearly all of the aldermen were present in the board room. The president took the petition, and called out these 13 aldermen who were opposed to the application. Alderman Heany went into the committee room, and saw one of these 13 aldermen reading a paper which was called the "Amended Petition of the Union Street-Railway Company." He asked, "What are you going to do about it?" The answer was, . "There will be no meeting to-day." Very soon the president came into the council chamber, and called the council to order. Six men answered to their names upon the roll call. Not one was there from among those 13 except Alderman Wafer who had not acted until that time with the 13. No quorum was present, and the council adjourned. It does not require one learned in the law to interpret such action. It is no less than dishonest evasion of duty. The learned counsel for the defendants who tried this case sees very clearly the force of this impeachment, and seeks to evade it by claiming that the amended petition was nevertheless considered, as appears in the reports of the committee. Even if this be true, it does not wipe out the history of that day, and the inferences necessarily drawn from it. But, if it be true, then the report of the railroad committee, in assigning, as one of the reasons for the rejection of the application of the Union Street-Railway Company, that its routes were disconnected from each other and from the main route, has given a dishonest reason, and one that the committee knew was untrue. Come next to the meeting of June 19th. The amended petition which had been attempted to be introduced upon June 12th was then offered, and referred at once to the railroad committee. Before looking at that petition, however, the committee made its report, by which was recommended to be granted to the defendant companies these valuable franchises, upon the terms before specified, and by which the application of the Union Street-Railway Company was denied. It appears that the percentage method of compensation was known to the defendant companies before the meeting. Alderman Wafer swears that the railroad committee had met, and determined upon the percentage plan of compensation, and had determined upon their reports. Alderman Thomas was a member of that committee, and had no no-

tice whatever of such a meeting, or no notice of the intended action of the majority of the committee. A notice was sent late to him of a meeting, of which he afterwards heard by accident from Alderman Jordan. That meeting he attended, but at that time there was no discussion as to the percentage plan of compensation, nor was there any determination as to what should be the report. The first information which Alderman Thomas had of the intended report of the majority of the committee was a few moments before the meeting of June 19th, when he was asked to sign it. Alderman Thomas was opposed to these grants. If he had been present at the meeting with the committee when the percentage plan was determined upon, probably these competing companies would have known of that fact, and have made bids upon that plan. But this was not what the railroad committee or these defendants desired. They wanted no bids upon the percentage plan. They did not even attempt to get a better compensation from the defendant companies. Alderman Thomas requested that he be given an opportunity to examine the reports from his own committee, and that an adjournment be had for that purpose. This was refused. Speeches were made by several aldermen in opposition to these reports. Not one word was said by any one in their behalf. It appeared to be unnecessary. By the vote of these same 13 these valuable franchises were then given to these defendant companies without giving to the Union Street-Railway Company or the Brooklyn City Railroad Company any opportunity to bid therefor.

The learned counsel for the defendants, however, ingeniously argues that that was the plan called for by the statute; that that was the plain referred to in the message from the mayor, in one of his communications to the council; and that these companies, therefore, should have known that that was the proper plan upon which they should make their bids. Whatever should have been known, however, not only the Union Street-Railway Company, but also the Brooklyn City Railroad Company, understood that the compensation was to be in the form of a lump sum. It matters little what was the cause of this mistake. It existed. It was apparent to those trustees, who were dealing with the property of their cestuis que trustent, of great value. They knew the mistake. If they were honest trustees, they would have corrected the mistake, so that these other companies would have had an opportunity to bid upon the plan which was adopted.

The consents themselves have one significant feature. In the provision for the payment of a percentage of gross receipts, is inserted the clause, "realized by it." Under the strict wording, then, if this road were rented for a nominal sum only, the percentage could be collected only on that nominal sum. It is not necessary to construe these words so placed. Counsel for defendants argue that the percentages are to be estimated on receipts on miles of streets, and not of single track, and that it is impossible that they should come below the $20,000, and will reach nearly, if not quite, $40,000. Why, then, was any provision inserted for 1 per cent. on receipts less than $20,000 a mile? Has this provision any connection with the words,

"realized by it"?   They are not found in the statute.   They are carefully chosen, and carefully placed.   They were not put there unwittingly.

In every act of the committee, or of the 13 aldermen who voted for these franchises, there is an apparent determination to grant to these defendant companies these valuable rights for as small a sum as they dare.   Foiled in their attempt to give them away, their studied effort is to prevent competition.   False to their trust, they endeavor to sell the property of their cestuis que trustent for as little as they can get.   The evidence of their fraudulent purpose is both direct and circumstantial.   It leaves in my mind not the shadow of a doubt.   Learned counsel have endeavored to cover the fraud by reports of this committee, ingeniously drawn.   With great ability have the counsel sought to divert the issue in this case unto a trial of the good faith of the Union Street-Railway Company.   The amended petition of that company, of May 22d, whereby they sought to obtain 13 disconnected routes, may well have caused suspicion in the minds of the board as to the good faith in presenting the same. If they had honestly met the amended petition of June 10th, which was given to the chairman of the board upon June 12th, and the railroad committee had been frank with this company upon June 9th, some color would have been given to the good faith of their suspicions.   When their action is considered, however, in the light of the application of the Brooklyn City Railroad Company, as well as of the Union Street-Railway Company, this action stands undefended.   The franchises are declared void.