JOHN ADAMSON, Respondent, v. THE NASSAU ELECTRIC RAILROAD COMPANY and Others, Appellants.

*Municipal corporation — has no private estate in its streets — the control of streets for railroad purposes is in the Legislature subject to the Constitution — Brooklyn charter, superseded by sub. 4 of § 4 of chap. 565 of 1890 — action under chap. 301 of 1892 — when it cannot be maintained — street railroad franchises — when the action of city authorities in granting them cannot be reviewed by the court.*

A municipal corporation has no private estate or interest in the public streets within its borders. While it is said to hold the title to the bed of the streets its title is that of a trustee for the people of the whole State. The absolute control of the streets and the direction as to their use is in the Legislature.

The constitutional provision which requires the consent of the local authorities to the construction and operation of a street railroad has not abridged this legislative power. The Legislature may still grant the use of the streets of a city for the construction of a street railroad subject only to the condition that the consent of the local authorities be obtained before the road is constructed or operated. The franchise proceeds from the Legislature, and the obtaining of the consent of the local authorities is the performance of a condition without which the road cannot be constructed.

A city has no power to alienate or appropriate the city streets and has no property rights therein, and the provision of the statute authorizing an action to prevent a waste of the estate and other property of a municipality refers to property owned by the city and within its power of disposition.

The charter of the city of Brooklyn declaring it unlawful to grant the right to construct a street railroad, except to the person who will agree to carry passengers upon such railroad at the lowest rate of fare, was superseded by the General Railroad Law (Subd. 4 of § 4 of chap. 565 of the Laws of 1890), which declares that every railroad corporation has the power to construct its road across, along or upon any highway which the route of its road shall intersect or touch, subject to the limitations and requirements of that chapter; that such was the legislative intention is made apparent by the amendment of section 92

of chapter 565 of the Laws of 1890 (the General Railroad Act), by chapter 434 of the Laws of 1893.

In the review of a legislative act the courts are confined to the consideration solely of the question of power.

In an action brought under the provisions of chapter 301 of the Laws of 1892, by a taxpayer of the city of Brooklyn to have certain grants of franchises for the operation of electric street railways declared null and void, the trial court found that the franchises were granted for a less sum than could be secured for them in the exercise of reasonable diligence, and that the granting of such consents for such less sum was a fraudulent act, and that, consequently, the franchises were given in bad faith, and as a matter of favoritism to the companies who obtained them.

There was no allegation in the complaint, nor was it claimed, that the aldermen who granted the franchises were corrupt, or that the consents were the product of corruption.

*Held,* that there was no provision of law which required that in the city of Brooklyn the right and privilege of using any street for the purposes of a street railway should be sold to the highest bidder;

That it was entirely discretionary with the local authorities whether they would require as a condition precedent to the granting of the consents the payment into the treasury of any portion of the gross receipts of the railroads to be constructed and operated therein;

That as all the proceedings before the common council were regular, and no formality requisite to its final action was omitted, the grant was a valid exercise of the legislative power, and as such was not within the province of judicial review;

That the mayor and common council of said city, in enacting the resolution complained of, exercised a part of the sovereign power of the People of the State, and, however unwise their action, and whatever the motive might have been which led to the passage of the resolution, the courts had no power to arrest its execution.

APPEAL by the defendants, The Nassau Electric Railroad Company and others, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of Kings on the 13th day of May, 1895, upon the decision of the court rendered after a trial at the Kings County Special Term, and also from the decision made by the justice presiding at the trial of the action, filed on the 13th day of May, 1895, upon which the judgment was founded.

The action was brought by a taxpayer of the city of Brooklyn, under chapter 301 of the Laws of 1892, to have certain grants of franchises for the operation of electric street railways declared null and void on the ground that the common council of said city

granted said franchises for a less sum than could have been secured for them in the exercise of reasonable diligence, and that such action on the part of the common council was wasteful and injurious to the property, funds and estate of the city.

*James C. Church* and *John J. Allen*, for the defendant railroad companies, appellant.

*F. L. Backus*, for Coffey, appellant.

*Grout, De Fere & Mayer*, for the respondent.

BROWN, P. J. :

The decision of the learned judge who heard this case at the Special Term is that " the court has found that such consents were granted by the common council of the said city fraudulently and as matter of favor to the defendant companies, and for a less sum than could be secured for them in the exercise of reasonable diligence."

There is no allegation in the complaint that the aldermen were corrupt or that the consents were the product of corruption, and the learned counsel for the plaintiff, upon the argument, expressly disavowed any claim to uphold the judgment upon that ground. An examination of the complaint and the testimony shows that the theory upon which the action was tried and decided was that the granting of the consents to the defendant companies " for a less sum than could be secured for them in the exercise of reasonable diligence " was a waste of the city property, and in that sense a fraudulent act, and that such is the sense in which the term fraudulent is used in the decision will appear from the allegations of the complaint and the opinion of the judge who tried the case.

The material allegations of the complaint are that the Union Street Railway Company, in or about the months of June or July, 1892, offered to compensate the city for the fair market value of " the right to construct and operate a railroad through the said streets, such compensation to be fixed by the common council aforesaid or determined by a sale thereof at public auction." That in May, 1893, it in substance repeated said offer. That in June, 1893, it requested the committee " to fix and announce the terms and conditions upon which the grants of the consent of said city * * * would be made, so that competitors therefor might be properly

informed and enabled to frame their bids." That it offered to pay for such grant certain named sums per mile, and requested if any other or better offer was made it be informed thereof, "so that it might increase its money cffer, and bid in conformity with such other proposition." That the common council " wrongfully * * * in violation of their official duties * * * and illegally and in waste of the property, funds, effects and estate of 'said city," passed the resolution complained of.

It is further alleged " that the right to construct, operate and maintain a street surface railroad over the said streets and avenues is a valuable right, part of the property, funds and effects of the city of Brooklyn, for which more could be realized by said city than is provided for in said resolutions," and " that by the Constitution and laws of this State the granting of the said right to construct and operate a railroad on the said streets was vested in the mayor and common council * * * for the said city, and in order that such grant might be made for the best attainable price and for the pecuniary advantage of the said city, * * * and the said power and right to make such grant was part and parcel of the property * * * of the said city, and could not be lawfully awarded for a price while any one was ready to pay a better price therefor."

The opinion states that the two propositions of fact essential to be established by the plaintiff were : " (1) That the franchises were granted for a less sum than could be obtained from a competing company ; (2) that such franchises were given in bad faith and as a matter of favoritism to the defendant companies." It is evident from the opinion delivered at Special Term and from the argument of counsel for the plaintiff that the decision was based upon the case of *Adamson* v. *Union R. R. Co.* (74 Hun, 3). That case may stand as an authority for the interference of the courts with municipal affairs upon the precise facts there existing, but if it is to be deemed an authority that the courts may, in a taxpayer's action, restrain the execution of ordinances and laws passed by municipal authorities in matters committed by the Constitution of the State to their judgment and discretion, it is in conflict with well-settled principles of law, and I shall, in this opinion, endeavor to show that the act of the municipal authorities of the city in granting the consents to the defendant companies violated no provision of law, and was a

valid exercise of power, and, being legislative in its character, is not subject to the review of the courts.

The facts which will permit the maintenance of an action by a taxpayer against municipal officers, and authorize the courts to interfere in the administration of municipal affairs and restrain officials within the limits of their powers, are quite well settled by recent decisions of the Court of Appeals.

In *Talcott* v. *City of Buffalo* (125 N. Y. 280) the court said: "We have referred to the origin of this statute under which the action is brought, the title of the act of 1872, and the language used by the Legislature subsequently, when re-enacting it in 1881 and 1887, for the purpose of ascertaining whether it was intended to authorize a taxpayer to maintain an action against the members of the common council in a city, and the administrative officers thereof, for the purpose of restraining officials acting within the limits and scope of their powers and discretion, such as is alleged in the complaint in this action, and we are of the opinion that it was not. Full force and effect can be given to the statute by confining it to a case where the acts complained of are without power, or where corruption, fraud, or bad faith amounting to fraud, is charged." And in *Ziegler* v. *Chapin* (126 N. Y. 342) it was again said: "We have quite recently declined to become arbitrators between taxpayers and their municipal officers in every instance of disagreeing opinions or conflicting judgments, and have decided that jurisdiction in the officials existing, the courts can interfere in actions like that before us only where some fraud or collusion or bad faith is alleged and proved."

In *Talcott's* case the acts sought to be enjoined were within the power and discretion of the common council, but were not charged to have been corrupt or dishonest. A demurrer to the complaint was sustained and the suit dismissed. In *Ziegler's* case an injunction was sustained on the sole ground that the contract entered into by the city officials was illegal and void.

The decisions in the cases cited followed logically the rule that, in the review of a legislative act, the courts are confined to the consideration solely of the question of power.

In *People ex rel. Wood* v. *Draper* (15 N. Y. 533), after referring

to the constitutional restraints upon legislation, Judge DENIO said : " If a particular act of legislation does not conflict with any of the limitations or restraints which have been referred to, it is not in the power of the courts to arrest its execution however unwise its provisions may be or whatever the motives may have been which led to its enactment."

In *People ex rel. McLean* v. *Flagg* (46 N. Y. 401), in speaking of the power of the courts to correct legislative abuses, Chief Judge CHURCH said : " But when power is conceded we have no right to inquire into the motives or reasons for doing the particular act."

Such is the universal rule arising out of the form of our government and settled by a long line of authorities, and it is fully applicable to the review of acts of municipal corporations done in the exercise of governmental powers. Judge COOLEY, in his work on Constitutional Limitations (*p. 209), says : " And the same presumption that legislative action has been devised and adopted on adequate information, and, under the influence of correct motives, will be applied to the discretionary action of municipal bodies and of the State Legislature, and will preclude, in the one case as in the other, all collateral attack." And in *Milhau* v. *Sharp* (15 Barb. 212), in speaking of the power of the common council of the city of New York, it was said : " As far as its acts in the exercise of its public political powers and within the limits of its charter, it is vested with the largest discretion, and whether its laws are wise or unwise, whether they are passed from good or bad motives, it is not the province of this court to inquire."

That in granting the consents to the defendant companies the mayor and common council were exercising a legislative power is too plain to require argument. The power to grant or withhold consent to the construction of a street railroad does not emanate from the Legislature, but is devolved upon the municipal authorities by the Constitution. (Art. 3, § 18.) The provision of the Constitution is a restriction upon the Legislature and forbids the enactment of any law authorizing the construction or operation of a street railroad, except upon the consent of the local authorities having control of the street or highway upon which it is proposed to construct the road. The power thus given is governmental, and to the extent that it is held and exercised, the local authorities are clothed with

sovereignty, and are as independent in its exercise as is any other department of the government, and, in my judgment, the courts can no more inquire into the motives which governed or controlled the lawful exercise of the power than they can inquire into the motives which induce the governor to give his assent to an act of the State Legislature. The only question, therefore, which the court was permitted to investigate and decide in this case, was whether the granting of the consents to the defendant companies was a legal act. As I have already pointed out, the plaintiff alleged it to be illegal, and this assertion was founded upon the allegation (1) that the power to make such grant was a part of the property of the city, and (2) that it could only be awarded to the person offering the highest price therefor.

Whether the right to grant consent to the use of the streets can be deemed the property of the city within the meaning of the acts of the Legislature authorizing taxpayers' actions, would seem not to be a very pertinent inquiry in view of the constitutional provision empowering the common council to do the very thing complained of. But the contention that the right to grant the consent to operate a street railroad is property of the city cannot, I think, be sustained. The law is quite well settled that a municipal corporation has no private estate or interest in the public streets within its borders. While it is said to hold the title to the bed of the streets, its title is that of a trustee for the people of the whole State. This was expressly decided in *People* v. *Kerr* (27 N. Y. 188), it being there said by Judge WRIGHT that the trust of the city was *publici juris*, held not for the benefit of the people of the city alone, but for the people of the whole State, as the agent of the State and a part of its governmental machinery, and Judge EMOTT, in the same case, speaking of the title of the city of New York to the streets and the power of that corporation over the same, said: "This is a trust for the benefit of the public, not of the adjacent proprietors alone, nor of the inhabitants or citizens of New York alone, but of the whole people. * * * The title thus vested in the city of New York is as directly under the power and control of the Legislature for any public purposes as any property held directly by the State or by any public body or officer, and its application cannot be challenged by a corporation which in respect to such property, at least, is a mere

agent of the sovereign power of the people." This rule has, since that case was decided, repeatedly been stated by the Court of Appeals.

The absolute control of the streets and the direction as to their use is in the Legislature. The constitutional provision which requires the consent of the local authorities to the construction and operation of a street railroad has not abridged this legislative power. It has only qualified or regulated it. The Legislature may still grant the use of the streets subject only to the condition that the consent of the local authorities be obtained before the road is constructed or operated. The franchise proceeds from the Legislature, and the obtaining of the consent of the local authorities is the performance of a condition without which the road cannot be constructed. (*Matter of 34th Street R. R. Co.*, 102 N. Y. 343.)

The city has no power to alienate or appropriate the city streets, and has no property rights therein, and the provision of the statute authorizing an action to prevent a waste of the estate and other property of a municipality plainly refers to property owned by the city and within its power of disposition.

We thus reach the question whether the common council was bound to grant the consents to the person offering the highest price therefor. The plaintiff strenuously insists that it was, and as one ground for declaring the consent void has referred us to a provision of the charter of the city, first enacted in 1861, declaring it unlawful to grant the right to construct a street railroad except to the person who should agree to carry passengers on such railroad at the lowest rate of fare. We are of the opinion that this provision of the charter is superseded by the General Railroad Law (Subd. 4 of § 4 of chap. 565 of 1890), which declares that every railroad corporation has the power to construct its road across, along or upon any highway which the route of its road shall intersect or touch, subject to the limitations and requirements of that chapter. That the Legislature intended this act to do away with all provisions of local laws is, we think, very plain, and is especially made so by the amendment of section 92 by chapter 434, Laws of 1893. The validity of a street railroad franchise is, therefore, to be determined under the Railroad Law as limited by the provisions of the Constitution heretofore referred to. There is no provision of the Railroad Law which requires that, in the city of

Brooklyn, the right and privilege of using any street shall be sold to the highest bidder. The provision that such privilege shall be sold at public auction is now limited in its application to the city of New York. In the city of Brooklyn and other cities of the State, the local authorities are given the power to require " the payment annually of such percentage of gross receipts, not exceeding three per cent, into the treasury of the city  *  *  *  as they may deem proper." The policy of the State, in this regard, as expressed in the statute of 1886 (Chap. 65), which required as a condition . of the consent to use the streets, a sale of the privilege at public auction, has, by recent legislation, been completely reversed as to the whole State, except the city of New York. Under the present law it is entirely discretionary with the local authorities whether they will require, as a condition precedent to the granting of the consent, the payment into the treasury of any portion of the gross receipts of the railroad to be constructed and operated therein. (§§ 93, 95, General Railroad Law.)

The testimony shows that all the proceedings before the common council were regular, and that no formality requisite to its final action was omitted, and as the right to grant consent to construct a railroad in the streets of the city is not the property of the city, and the local authorities are not required to grant such consent to the highest bidder, the conclusion necessarily follows that the grant to the defendant companies was a valid exercise of legislative power, and as such is not within the province of judicial review. By the Constitution and the Railroad Law of the State, now existing, the granting of the consents and the terms upon which they should be given were committed to the judgment and discretion of the mayor and common council of the city. In enacting the resolution complained of, they exercised a part of the sovereign power of the people, and, as was said by one of the ablest judges of our State, however unwise their action, whatever the motive may have been which led to the passage of the resolution, the courts have no power to arrest its execution.

The judgment must be reversed and the complaint dismissed, with costs.

DYKMAN and PRATT, JJ., concurred.

DYKMAN, J.:

Municipal corporations are creatures of law and clothed with powers and functions to be exercised for the public welfare. In the extent of their powers and liabilities they differ materially from counties, towns and other *quasi* corporations which are created for governmental purposes alone. The officers of such corporations are viewed as trustees of the State residing within the territorial limits of the city. In respect to the public and governmental functions with which such corporations are clothed, they are vested and are to be exercised for public purposes; they are sovereign powers to be exerted in the interests of the entire public. It would be a very narrow view of the powers and duties of municipal officers that would confine their exercise to the aggrandizement of the local treasury. Financial considerations are not alone to control in granting permission to prosecute the various enterprises conducted by individuals and private corporations within the municipality. In all such cases the welfare of the public must be considered, and in the exercise of its governmental functions the municipal authority is required to determine the questions by the exercise of judgment and discretion in the interest of the whole community. So far as a discharge of the duties devolved upon municipal authorities requires the exercise of judgment and discretion, they must be, to a great extent, final and conclusive when free from fraud and corruption. It would be quite destructive of local self-government if all the acts of city and village authorities within their jurisdiction were subject to judicial review and control.

Mistakes and errors of judgment may occur in the performance of such duties, but it is not in accordance with our system of government to apply to the courts for their correction. Prior to the enactment of several statutes, which authorized an action in favor of taxpayers to prevent waste or injury to public property, funds or estate, judicial interference with the action of public bodies within their powers was never invoked.

Those statutes came before the Court of Appeals for consideration and application in the case of *Talcott* v. *The City of Buffalo* (125 N. Y. 286), and it was there said: "The terms 'waste' and 'injury' used in this statute comprehended only illegal, wrongful or dishonest official acts, and were not intended to subject the official

action of boards, officers or municipal bodies, acting within the limits of their jurisdiction and discretion, but which some taxpayer might conceive to be unwise, improvident or based on errors of judgment, to the supervision of the judicial tribunals. It is believed that no action was ever maintained under this statute with the sanction of this court without some proof or allegation that the official act or proceeding complained of was without power or was tainted by corruption or fraud."

The decision was that the provision of the Code of Civil Procedure, section 1925, authorizing an action by a taxpayer to prevent waste or injury to the property of a municipality, as supplemented by the subsequent statutes on the same subject, is confined to cases where the acts complained of are without power, or where corruption and bad faith amounting to fraud is charged, and that the word waste includes only illegal, wrongful or dishonest action. The Constitution and the laws have delegated to the local authorities the control over the streets in the cities with authority to consent to their use for a surface railroad.

The performance of their duties in that regard requires the exercise of judgment and discretion, and the presumption always is that their action has been prompted by correct motives.

Municipal officers are not the agents of the city; they are public officers clothed with certain powers for convenience of government, and interference with their action by the courts would be an invasion of their province and amount only to a substitution of the judgment of the judges for that of the officers.

The foregoing principles will aid us in our further progress in the examination of this appeal.

Turning now to the case before us, we find it to be a taxpayer's suit under the several statutes mentioned.

The defendant railroad companies are two corporations to which franchises have been granted by the city of Brooklyn to construct and operate surface railroads over certain streets named in the petition. The city of Brooklyn and the mayor and aldermen of that city are also made parties defendant. After stating the application for leave to construct the railroads, and the action of the common council thereon, the complaint continues as follows:

" That by the aforesaid illegal and wasteful acts of the individual

defendants, the defendant railroad companies claim, nevertheless, to have acquired the valid consent of the city of Brooklyn to the construction and operation in conjunction, of a railroad over the streets and avenues mentioned in paragraph fourteen of this complaint, and are about to proceed so to do," and then prays for judgment declaring the grants to the defendant companies illegal and wrongful to the estate and funds of the city.

There is no charge of fraud or corruption in the complaint. The only allegation of malfeasance is that the members of the common council wrongfully and willfully and in violation of their official duties to the said city, taxpayers, freeholders and electors thereof, and illegally and in waste of the property, funds, effects and estate of said city, and solely in order to favor the defendant railroad companies and the persons managing such companies and interested therein, and colluding with such persons with intent to prevent said city from getting fair and adequate and the largest compensation for such streets, granted to said companies the right to construct and operate railroads on the route specified. There is no averment of want of power in the common council to perform the acts of which the plaintiff complains, or that such acts were not within the jurisdiction of the municipal authorities, and there is no complaint of any irregularity in the proceedings.

The averments in the complaint amount, at most, to a charge of mismanagement or improper administration of public affairs, and, as we have already seen, it requires much more to justify the interference of a court of equity to supervise or correct the action of municipal authorities.

The law affords no appeal to the courts from their action. Judge BROWN said, upon the application for a preliminary injunction in this action : "Very much must be conceded by the courts in a case of this character to the judgment and discretion of the municipal authorities, and their action cannot be nullified simply upon the ground that the court thinks they should have afforded more opportunity to other corporations to bid for their consent or to give greater or more favorable consideration to real bidders.

"The law does not afford an appeal from their decision. In the absence of illegal or corrupt action, bad faith will justify interference by the court, only in cases when it amounts to fraudulent

action, and in such cases the fraud must be shown to be productive of waste or injury to city property." When Judge CULLEN heard the case before him on demurrer to the complaint, he said : " The local authorities might deem that a road of a particular character would so much better subserve public interest than one of another character, that it would be wiser to grant consent to the first without compensation than to the second for compensation. I think, therefore, that the whole subject is within the power and discretion of the local authorities, if that power be exercised without fraud, to determine whether a consent shall be given to a particular company, and the reasons and considerations that shall dictate their course."

The proof fails to bring the case up to the charge in the complaint.

On the 22d day of May, 1893, the two defendant railroad companies, which were associated together, and with the Coney Island, Fort Hamilton and Brooklyn Railroad Company, so as to be substantially one concern, applied to the common council of the city of Brooklyn for consent to lay down railroad tracks in certain streets of that city. On the same day, the Brooklyn City Railroad Company applied for a consent covering the most but not all of the same streets, and also covering other streets. On the same day, the Union Street Railroad Company applied for a consent in respect to the streets covered by the application of the Brooklyn City Company, but omitting, as the latter company had done, a part of the streets applied for by the defendant companies, and including many streets for which the latter companies did not apply. The Brooklyn City Company offered to pay to the city $150,000 for a consent to build on the streets according to its application and that of the defendant companies; the Union Street Railway Company offered to pay the city various sums per mile, amounting to between $250,000 and $260,000. The defendant companies made no specific offer, but expressed a willingness to make such compensation as the common council might deem proper. All the provisions of the Railroad Law as to notice of hearing and consideration of defendants' application were duly complied with. On the 19th day of June, 1893, the board adopted resolutions granting to the defendant companies the consents for which they applied, and granting to the Brooklyn City

Railroad Company a consent for a portion of the streets for which it applied.

The consents which were granted imposed by way of condition the payment to the city of Brooklyn of the following percentages of gross receipts of the railroads to be constructed, namely, one per cent when the receipts were $20,000 or less per mile; two per cent when the receipts were more than $20,000 and less than $40,000 per mile, and three per cent when receipts exceeded $40,000 per mile. The application of the Union Street Railway Company was refused for the reason stated in the report of the committee to which it was referred, and which was substantially as follows: "There is before the common council an application by the Union Street Railway Company for its consent to the construction of a street surface railroad upon the same routes as those covered by the application of the Nassau Electric Railroad Company. These routes are understood to be proposed extensions of the main route of the Union Street Railway Company's road, designated in its certificate of incorporation as covering Union street from Hamilton Ferry to Prospect Park Plaza. The routes of the Union Street Railway Company do not extend beyond the city line, and in that respect do not afford the facilities for travel presented by the Nassau Electric Railroad Company. It is a consideration deemed worthy of mention that by far the greater part of the Union Street Railway Company's route consists of extensions of the route described in its articles of association, upon no part of which as yet a road has been built. Your committee is advised that there is grave doubt of the power of a railroad company to apply for or take a grant of a right to extend a route of an unconstructed railroad, and before an application for extension can effectually be made there must be an existing railroad to which such extensions will apply.

" If such be the law, a grant to the Union Street Railway Company would be entirely inoperative, and the public would not realize from it any of the increased facilities for travel of which it stands in need. Upon the question of compensation for franchises, your committee, after mature deliberation, has reached the conclusion that a graded percentage upon gross receipts is in harmony with the spirit of the statute relating to the subject, will produce the largest revenue to the city, and is favorable to the latter as a continuing

source of income, and, so far as concerns the railroad company, should not be regarded as burdensome, because the payment thus imposed will be measured by the earnings of the company."

The report of the committee, and the resolution proposed by it and adopted by the board, manifests a thorough and careful examination and acquaintance with the subject, and a proper consideration and regard for the interests of the city and the welfare of the pub-- lic. This lengthy extract is made from the report to show that the whole subject was thoroughly considered, and also to manifest the reasons which actuated the aldermen in their action in respect to the bestowment of the franchises to the defendant companies and refusing the request of the Union Company. We are not concerned with the refusal to grant the request of the Union Company beyond its reflection upon the motives of the aldermen and the interests of the city, because no relief is sought in that respect. In regard to the motives of the aldermen, the doubt expressed respecting the validity of the grant to the Union Company for an extension of its route anterior to the construction of any portion of its road, and the fact that the route of the Union Company is covered by the other lines, and does not extend beyond the city limits, are proof of their sincerity and correctness.

The very term "extension" implies the existence of something to be extended, such as a street or a field. Such were the views of Judge EARL, expressed in the case of *The People* v. *Broadway R. R. Co.* (126 N. Y. 39), where he said : "It cannot be properly said that a road is "extended" unless it is then and there existing to be extended. The very language implies that the road was to be built, and then after the opening of the avenue mentioned, extended." ·

But there are reasons why such a grant for extension would be nugatory beyond the mere signification of the term extension. The effect of filing an extension certificate, if valid, is to give the railroad company the same corporate capacity with reference to the extension to construct, maintain and operate a railroad as that which it acquires by filing its articles with reference to its original route.

Inasmuch, therefore, as the filing of the original articles does not give any corporate capacity whatever, unless certain conditions are performed in respect to the amount of the capital stock per mile, and the payment of at least ten per cent of the minimum capital

and evidence of a *bona fide* intent to build and operate the railroad and the payment of one-eighth of one per cent of the amount of stock to the State, the statute authorizing the extension ought to be so construed as not to make it subversive of the general policy of the Railroad Law and as not to enable companies to accomplish indirectly what they could not accomplish directly otherwise than by compliance with the conditions prescribed by the statute.

Moreover, as the route of the Union Company did not extend beyond the bounds of the city, its facilities for accommodating the public were limited and less extensive than those of the other companies. Again, it is to be observed that the income based upon the percentage of gross receipts will be perpetual, and, therefore, more advantageous to the city than the sum offered by the Union Company. As there is no cause for the interference of the court upon the ground of fraud, so we find no reason for interference by reason of waste or injury to the funds or property of the city even according to the most technical definition of those terms. In the sense in which they are employed in the statute they include only wrongful or dishonest, illegal action as we have already seen. The general view is that the permission to the defendant companies could have been granted without compensation, but if such grants are to be considered as property, the city is to receive compensation, and so no waste has been committed. When it is claimed that the aldermen could and should have made a more rigid bargain, the answer is that the subject rested in their discretion. Tested by the application of both reason and authority according to the principles laid down in the commencement of this opinion, the record before us discloses no case for the interference of the court. There are many details which cannot be stated within the reasonable length of an opinion, but we have examined the entire case with care, and we have reached the conclusion that the judgment is erroneous. It invades the jurisdiction of a governing body which is as independent within its sphere as the judiciary is in its. In the dissenting opinion of Judge PECKHAM in the *Talcott* case, he said : " Under the statute as it now reads I think the court has jurisdiction to enjoin the performance of an act by a public officer of the kind mentioned therein, if it be of such a character as to necessarily result in a plain, bald, useless waste of the property or funds of the public. The act

must be such that there can be no fair question in the judgment of reasonable men as to its character. It must be plainly and beyond all fair controversy wasteful; a mere squandering of public funds."

The proofs in this case leave it far below that requirement.

The case has attracted much public attention, chiefly because it arose at a time when there was considerable excitement in the public mind. But the courts are beyond the voice of clamor, and must decide the law with serenity and independent of external strife or opinion.

The judgment should be reversed, and the complaint dismissed, with costs.

BROWN, P. J., and PRATT, J., concurred.

Judgment reversed and complaint dismissed, with costs.