(23 App. Div. 124.)

NORRIS v. WURSTER, Mayor, et al.

(Supreme Court, Appellate Division, Second Department. December 28, 1897.)

1. GREATER NEW YORK CHARTER—USE OF STREETS.

     2. COURTS—JURISDICTION—REVIEW OF MUNICIPAL GRANT.

     Where, in a taxpayer's action brought to restrain such a grant by the municipal body, the complaint charges that the members thereof, inspired by corrupt motives, intend to exercise a power they do not possess, and

there is evidence that the grant would cause irreparable injury, the juris-
diction of the supreme court to investigate the legality of the grant is
not impaired by article 3, § 18, of the constitution.

8. SAME—ACTION BY TAXPAYER.
    Such an action will lie under the taxpayer's act (3 Rev. St. [9th Ed.]
p. 2530, § 1), which, being for the benefit of the public, and intended to pre-
vent fraud, should be liberally construed.

4. INJUNCTION—WHEN GRANTED.
    In such an action, the facts that the granting of an injunction pendente
lite would, in effect, be a final decision, because the term of the board is
about to expire, and that, if the injunction were to be denied, the legality
of the proposed act could thereafter be determined upon a trial of the
action, do not diminish the propriety of granting the injunction if a clear
case is made out.

Appeal from city court of Brooklyn.

Action by John Norris against Frederick W. Wurster, mayor, and
others. From an order continuing a temporary injunction, defend-
ants, except Wurster, appeal. Affirmed.

Argued before GOODRICH, P. J., and CULLEN, BRADLEY,
BARTLETT, and HATCH, JJ.

James C. Church, for appellant railroad.
Luke D. Stapleton, for appellant aldermen.
Joseph A. Burr, for respondent mayor.
James W. Gerard, Jr. (John M. Bowers, on the brief), for respond-
ent Norris.

GOODRICH, P. J. This is a taxpayer's action, instituted to re-
strain the defendant Wurster, as mayor of the city of Brooklyn, from
approving, and 28 other defendants, constituting the board of alder-
men of the said city, from passing over the mayor's veto, if he should
exercise that power, two certain resolutions already passed by such
board, granting to the other defendants (the East River & Atlantic
Ocean Railroad Company and the Nassau Electric Railroad Com-
pany) the consent of the common council to the construction, use,
and operation of a railroad in certain streets of the city for a pe-
riod exceeding 25 years. The complaint alleges that on February
3, 1896, an application was made to the board of aldermen by the
East River road, praying that the common council would grant con-
sent to said company to the building and operation of double-track
street surface roads upon an unusually large number of streets,
and for 14 different routes, many miles in extent, and that another
application, of the Nassau road, was presented on the same day, of
a somewhat more modest character, and relating to one route only.
Both applications were referred to the standing committee on rail-
roads, which was appointed at the organization of the board in Jan-
uary, 1896, and consisted of Aldermen Francisco, Haubert, Wass-
muth, Thompson, Myers, Hennessy, and Guilfoyle. This committee
had hearings on the subject on February 27, March 13 and 30, and
on April 10, 1896, and at no subsequent time. But at the time of
the customary organization of the board in January, 1897, the mem-
bership of this committee was changed. Francisco and Haubert
ceased to be members, and their places were filled by Aldermen Tay-

lor and Dunne, so that the personality of the committee was materially altered. For some unexplained reason the matter slumbered in the committee room during the remainder of the year 1896, and until November 29, 1897, when the new committee, without any public notice of its intention, made a report in favor of granting the application. There is nothing in the record to show that any public hearing was held before this new railroad committee, or any deliberation had thereon by the committee, public or otherwise, except such as may be derived from the fact that the new committee recommended the giving of the consent. It becomes necessary to refer to the changes which had taken place meanwhile in the condition of the city, as affected by new legislation. The act consolidating the territory of the so-called "Greater New York" became a law on May 11, 1896. The charter of the new municipality was passed by the legislature in May, 1897, and later the act providing for the election of the officers of the new city, under which the new officers were elected in November. The official term of the aldermen was near its end, and they had but a single month to exercise their functions, when suddenly, and on November 29, 1897, nearly 22 months after the original application, and after the passage of the new charter, after the election of the officers for the new municipality, and in the dying hours of the board of aldermen, the sleeping project was aroused from its slumbers. On that day the new committee made a report to the board, recommending the granting of a consent to the defendant the East River & Atlantic Ocean Railroad Company, and submitting resolutions giving such consent; and the board on the same day passed a resolution granting such consent, by a vote of 17 to 5. It is needless to say that the public and any taxpayer might well be startled by the gigantic proportions of the franchise thus suddenly consented to, and, so far as the record discloses, without immediate previous notice to the public, or any other notice except that, as the resolutions state, early in the year 1896, a notice was published in two Brooklyn newspapers of the time when a hearing would take place before the committee. It is clear that no public action was taken by the committee from April, 1896, till November, 1897. The answer of the mayor alleges his intention to veto the resolution, and it was stated on the argument that he had done so. The corporation counsel of the city, appearing for the mayor, in his brief and in oral argument expressed his conviction that the injunction should be continued pendente lite. The consent was, on its face, in perpetuity, and not for 25 years. The only benefit derived by the city and its citizens was that the consent required the company to sell six tickets for 25 cents, and pay the city 3 per cent. of the gross receipts. The complaint alleges that the value of the franchise is a million of dollars; and, while some of the answers deny that this is a true estimate, it is conservative to say that the conditions of payment attached to the consent to such a valuable franchise were not exorbitant. It is unnecessary to say that the consent of the board to a franchise of such generous proportions required the most careful deliberation and consideration by a body to which the public had confided the protection of its interests, and

should have been open to public attention, and that the court is called upon to review this action with scrutiny, and a careful regard for the public interests.

Some of the questions involved in this appeal have already been passed upon by the learned appellate division of the First department, in the case of Gusthal v. Board (not yet officially reported) 48 N. Y. Supp. 652; and, even if we did not agree with its conclusions, we should hesitate very long before differing therefrom. But we see no reason for any difference. We agree with its conclusion that it was the intention of the new charter that after its passage "the granting of any franchises, except such as are mentioned in that section [section 73], within the territory of the greater city of New York, is forbidden." Section 73 forbids the granting of any franchise to any person or corporation for a longer period than 25 years, with certain provisions for renewal, to which it is unnecessary to refer. The consent before us is unlimited in its term, and is consequently for a period in excess of 25 years; and, adopting the conclusion of the court in the Gusthal Case, we hold that such a consent is unauthorized and illegal. A similar result has been reached by Judge Lacombe, of the United States circuit court, in the case of Seccomb v. Wurster, 83 Fed. 856, based upon similar allegations, in a very learned and elaborate opinion, in which he holds that an injunction should issue to restrain the grant of a franchise for more than 25 years. If it were necessary further to refer to the new charter, we might say that it is hardly to be expected that an instrument of such great extent and importance would be perfect, and beyond criticism. The days of miracles and inspiration seem to have passed from the pages of history, and we may look only for reasonable accuracy in the expression of legislative intent in legislative acts. We think the intent of the charter referred to is sufficiently apparent from the scheme of the entire instrument.

But the learned counsel for the defendants other than the defendant Wurster insist that in granting the consent the board was performing a legislative act, and is in that respect a branch of the government co-ordinate with the court, and that consequently this court has no power to arrest the execution of these acts. His argument proceeds on the theory that the authority of the board is derived directly from the constitution, without intervention of legislative enactment; and in support of his contention he cites the case of Adamson v. Railroad Co., 89 Hun, 261, 34 N. Y. Supp. 1073, where the general term of the Second department, on appeal from a final judgment, held that in granting consent to the construction of a street railroad the mayor and common council were exercising a legislative power devolved upon them by the constitution; but the court in that case expressly recognized the right of the courts to investigate the power of the board, and to decide whether the granting of the consent was a legal act. The provisions of the constitution (article 3, § 18), in effect, constitute a limitation upon the power of the legislature to pass any law giving to any municipal body the right to authorize the construction or operation of a street railroad, except upon the condition that the consent of the owners of one-half in value of the property

bounding on, and the consent of the local authorities controlling, the streets, should be first obtained, or a substituted consent obtained from the appellate division of the supreme court. It does not follow that, because there are words in the constitution creating such a limitation, the legislature can confer upon the local authorities power to consent to such a grant, when the granting is otherwise illegal, or that it may not repeal such power by subsequent legislation; and, as we have said, we have adopted the view that the consent of the board was illegal, being given after the passage of the consolidation act of 1896, and for a term exceeding 25 years. In the Adamson Case the court expressly stated that there was no allegation in the complaint that the aldermen who granted the franchises were corrupt, or that the consents were the product of corruption. Ziegler v. Chapin, 126 N. Y. 342, 27 N. E. 471, was an appeal to the court of appeals from an order of the general term of the Second department affirming an order of the special term granting an injunction pendente lite. The court held that the taxpayer's action authorized by section 1925 of the Code of Civil Procedure was intended to restrain illegal acts on the part of public officials, and that, as the contract was illegal, a temporary injunction was properly granted. One of the allegations of the complaint is that the board of aldermen is not invested with, and does not possess, the right or power to grant to any person the right to occupy the streets for a period exceeding 25 years, and that 17 members of the board have agreed with one another, and with the defendant corporations, to vote to pass the resolution over the mayor's veto, if he should exercise that power. The complaint contains allegations which amount, substantially, to a charge that the defendant aldermen, inspired by corrupt motives, intend to exercise a power which they do not possess. It is undoubted that the court might, after such action of the board, and on trial of the issues herein, decide that the board had no authority to give such consent; but that does not forbid the exercise by the court of the power to restrain pendente lite an absolutely illegal act, provided there is evidence to show that irreparable injury will result to the plaintiff by the attempted exercise by the board of a power which it does not possess. It is evident that some of the defendants, or their counsel, believe that some benefit will result from the reversal of the order granting the preliminary injunction, and it is our duty to ascertain whether some corresponding injury may not result to the plaintiff and the public. It is evident that, if the resolution is not passed over the mayor's veto, there will be lessened litigation, while, if it is passed, citizens and taxpayers will be compelled to extraordinary litigation to undo a wrong, and that the defendant corporations believe that they will have some coign of vantage from which to repel the attacks of their adversaries.

It is further contended that no injunction pendente lite should have been granted, inasmuch as the effect of such order is to prevent the board from passing the resolution over the mayor's veto before the expiration of their term of office, and that this would be an inequitable exercise of judicial power, by preventing by indirection what ought to be only directly adjudged, and that no harm can result

to the public by permitting the board to exercise a power which we hold that it does not possess, as the question of the legality of its exercise can be determined only and finally by a trial of the issues in this action.  We cannot assent to such a contention.  If the action is clearly illegal, and if we could not possibly arrive at any other conclusion, even upon the theory advanced by the defendants, we can hardly be expected, by reversing the order of the special term, to be practically a party to what we have declared to be illegal and an invasion of the public rights.  If the act enjoined is an illegal act,—and we hold it to be such,—we should not hesitate to restrain it in order that the intention of the legislature in regard to the rights and powers of the new municipality may be conserved.

The answer of the defendant Wurster sets up certain defenses, and contains a demand for affirmative relief to restrain the members of the board of aldermen from passing the resolutions over his veto; and these allegations, not denied by the other defendants, constitute matter which justifies a preliminary injunction.  The answer denies that any resolution was passed granting any franchise to the Nassau Railroad Company, and alleges that no public hearings were had before the standing committee on railroads of 1897, as required by section 92 of the railroad law; that the application is for permission to lay tracks on prospective streets which are not yet laid out, and over and upon the tracks of other railroads on certain streets; and that the routes contained in the resolution differ from those in the articles of association of the East River road.  It is not necessary to express any opinion upon the points raised by this answer, and it is sufficient to say that the answer interposed by the mayor, the official head of the city government, sets up facts which may stamp the resolution as illegal.  In the case of Seccomb v. Wurster, already cited, and involving the same resolution, Judge Lacombe holds that the taxpayer's act authorizes a suit of this character.  The taxpayer's act (3 Rev. St. [9th Ed.] p. 2530, § 1) authorizes the bringing of an action by a taxpayer against the officers of a municipal corporation to prevent any illegal official act on the part of such officers; and under the allegations of the complaint, as well as of the answer of the defendant Wurster, the question of illegality is sharply and distinctly raised.  It is well settled that where an act of the legislature is for the benefit of the public, and intended to prevent fraud, it should be liberally construed.  We cannot close our eyes to the fact that grave suspicions are at once, invariably and always, aroused by any act of public officials which is shrouded in mystery until the sudden disclosure of an astonishing result, and consent of officials is given to the grant of a valuable monopoly in the public streets, especially when it is the exercise of the fast-fading power of a dying body, and the result is to extend over, and be used during, subsequent years, when new methods and new safeguards have been provided for the preservation of public rights of great value.  A refusal of the defendants to exercise a doubtful power under those circumstances would have given rise to no suspicion of their motive or intention, and we cannot withhold our belief that the converse of that

proposition is equally apparent. We are of the opinion that the action of the board in passing the resolution for a consent to the construction and operation of a railroad for an unlimited period was illegal, and, as such, we entertain no doubt of the power and duty of the court to enjoin further action in that direction pendente lite.

The order appealed from is affirmed, with costs.

BRADLEY and HATCH, JJ., concur. CULLEN and BARTLETT, JJ., concur in result.