(90 App. Div. 275.)

HEERWAGEN, Comptroller, v. CROSSTOWN ST. RY. CO., et al.

(Supreme Court, Appellate Division, Fourth Department. January 5, 1904.)

1. FRANCHISE TAX—DEDUCTIONS—PERCENTAGE OF GROSS EARNINGS.

Under Laws 1884, p. 309, c. 252, requiring a street car company in a city of over 250,000 inhabitants to pay to the city a fixed percentage of its gross income, a company was organized, and purchased a franchise by bidding at public auction the highest percentage on its gross earnings in addition to that above referred to, this method of sale being expressly required by Laws 1886, p. 81, c. 65, as amended by Laws 1886, p. 919, c. 642, and Laws 1889, p. 756, c. 564. Later the city, by an agreement with the companies operating therein, accepted a fixed uniform percentage on the gross earnings of each company in lieu of the percentage formerly paid, which agreement was approved by Laws 1892, p. 311, c. 151. *Held*, that such percentages are in the nature of a tax, within Laws 1899, p. 1593, c. 712, § 46, deducting from the tax on a street railway franchise any percentage on gross earnings paid under any agreement or statute, which payment is in the nature of a tax.

2. SAME—LAMP TAX.

Laws 1899, p. 1593, c. 712, § 46, deducting from a street railway franchise tax any sums paid under any agreement therefor, or statute requiring the same, based on a percentage of gross earnings, or any other income, or any license fee, or any sum on account of the franchise, does not authorize the deduction of the lamp tax levied under the city charter of Buffalo (Laws 1891, p. 224, c. 105, § 414), one half paid out of the general fund and the other half levied on the taxable property of the taxing district.

3. SAME—WHAT PAYMENTS DEDUCTED.

In Laws 1899, p. 1593, c. 712, § 46, providing that if, when a street railway franchise tax is due, the company has paid to a city for its use, under any agreement therefor, or under any statute requiring the same, any sum based on a percentage of gross earnings, or any other income, or any license tax, or any sum on account of the special franchise, "which payment was in the nature of a tax," all amounts so paid shall be deducted from the franchise tax, the term "payment" includes all the sums designated, so that the right to the deduction in each case depends on whether it is in the nature of a tax.

4. SAME—ASSESSMENT—TAX DISTRICT.

Under Laws 1899, p. 1590, c. 712, § 42, providing that the valuation of a special franchise by the State Board of Tax Commissioners shall be delivered to the officers charged with making local assessments in each tax district, and Laws 1896, p. 796, c. 908, § 2, defining a tax district, the valuation of a street railway company's franchise was properly placed on the assessment roll of the ward in which it had its principal office, as an indivisible sum, instead of apportioning it among the various wards

5. SAME—VIOLATION OF AGREEMENT.

Laws 1899, p. 1589, c. 712, imposing a tax on the value of the franchise of a street railway company payable to the city, does not violate an agreement approved by Laws 1892, p. 311, c. 151, whereby the city agreed to accept a fixed annual percentage on the gross earnings of the company in lieu of percentages formerly paid, which had been imposed by statute.

McLennan, P. J., and Hiscock, J., dissenting.

Appeal from Trial Term, Erie County.

Action by Fred W. Heerwagen, comptroller of the city of Buffalo, against the Crosstown Street Railway Company and others. From a judgment in favor of plaintiff, defendants appeal. Reversed.

Argued before McLENNAN, P. J., and SPRING, WILLIAMS, HISCOCK, and STOVER, JJ.

Porter Norton, for appellants.

Charles L. Feldman, Corp. Counsel, and Percy S. Lansdowne, for respondent.

SPRING, J. This action was commenced to recover a tax for the fiscal year 1901, levied against the franchise of the defendant the Crosstown Street Railway Company in accordance with the Special Franchise Tax Law (chapter 712, p. 1589, Laws 1899), and which tax, it is claimed, was due and unpaid the city of Buffalo. The defendant had paid to the city, within the year next preceding the maturity of the tax, certain percentages which it contended should be deducted from the amount of the tax, in compliance with section 46 of the state franchise law, which deduction the plaintiff declined to allow. The construction of that question is the central question to be considered upon this appeal.

The defendant the Crosstown Street Railway Company is a domestic street surface railroad corporation organized on the 5th day of February, 1890, pursuant to chapter 252, p. 309, of the Laws of 1884, and is operated within the city of Buffalo, N. Y. By this act, which is entitled, "An act to provide for the construction, etc., of street surface railroads," the consent of the local authorities of a city to the construction of such railroads along its streets was provided for, and a sale of the franchise at public auction was permitted. By section 8 of the act every such corporation constructing or operating a railroad within any city of the state "having a population of two hundred and fifty thousand or more," which included the city of Buffalo, was obliged to pay annually into the treasury of the city where its road is operated, "to the credit of the sinking fund there, three per cent. of its gross receipts," and after the expiration of five years 5 per cent. of such gross receipts. As to cities not containing 250,000 inhabitants, the local authorities were permitted at their option to sell the franchise to the highest bidder (section 7), or to require without a sale, as a condition of granting their consent, the annual payment of a percentage of the gross receipts, not exceeding 3 per cent., as they might elect (section 8). They could not order the sale and also impose the percentage assessment. They had the election of the two remedies, not the authority to impose both.

The "Cantor Act," so-called (chapter 65, p. 81, Laws 1886, amended chapter 642, p. 919, Laws 1886, and chapter 564, p. 756, Laws 1889), was thereafter passed, entitled, "An act to secure adequate compensation for the right to construct * * * street surface railroads in cities and villages." By section 1, c. 642, p. 919, Laws 1886, it was required of the local authorities of a city, as a condition of granting its consent to the construction or extension of a street railroad over any of its streets, "that the right, franchise and privilege of using the said street * * * shall be sold at public auction to the bidder who will agree to give the largest percentage per annum of the gross receipts of said company or corporation," but the section expressly retained in force the percentages authorized by the act of 1884 above mentioned. The General Railroad Act (chapter 565, p. 1082, Laws 1890) was thereafter enacted, article 4 of

which pertains to street surface railroads. So far as concerns any inquiry germane to the present discussion, it made no essential change in the payment of percentages. The only method by which any city or village was enabled by that act to derive any revenues from the sale of its franchises was upon the percentage system. Sections 93 and 95, pp. 1109, 1111. By this act all the acts above mentioned, viz., chapter 252, p. 309, Laws 1884, chapters 65 and 642, pp. 81, 919, Laws 1886, and chapter 564, p. 756, Laws 1889, were repealed. The act took effect May 1, 1891, and since that time the only sale of a franchise permitted by municipal authorities has been upon a percentage of its gross earnings. There has in fact been no time since the act of 1884 when in the city of Buffalo the sale of a franchise to a street surface railroad company was permissible except upon payment by percentages, and that system came into being by that act. The general railroad law was enacted after the sale to the defendant, and of course it is of no importance to the subject under review.

The necessity of obtaining the consent of the local authorities to the construction of a street railroad has long been required by the state Constitution (Const. 1846, art. 3, § 18, as amended, continued in the same article and section of the Constitution of 1894). The franchise, however, including the control of the streets, is in the state (Adamson v. Nassau Electric Company, 89 Hun, 261, 34 N. Y. Supp. 1073), but the tendency has been to commit to the municipal authorities the right to dispose of the same. Skaneateles W. W. Co. v. Village of Skaneateles, 161 N. Y. 154–165, 55 N. E. 562, 46 L. R. A. 687; Barhite v. Home Telephone Company, 50 App. Div. 25–31, 63 N. Y. Supp. 659. The Legislature, in its delegation of authority, may place restrictions upon its exercise, and, as the agent must keep within his restricted authority, so the municipality must keep within the compass of the grant conferred. The sale of the franchise could therefore only be had upon percentages for the sovereign power so decreed. The defendant or any other railroad company desiring to construct and operate a railroad within the city of Buffalo must pay for that privilege. That payment must be to the city, and by annual charge at a fixed rate.

On the 6th of February, 1890, the Crosstown Railway Company was the highest bidder at a public sale made by the comptroller of the city of the privilege or license to use certain streets set out at large in the notice of sale for the purpose of constructing and operating a street surface railway. Its bid was 11¾ per cent. of its gross earnings, and it entered into the agreement stipulated for in the notice of sale. The said company was thus obliged to pay the 3 per cent. of its gross receipts conformably to section 8, c. 252, p. 312, Laws 1884, and in addition the percentage assumed by its bid in the open market and its consequent agreement.

In 1892 there were two other street surface railroad companies in the city of Buffalo, and the three were operating independently of each other. The Buffalo Railway Company charged a transfer fare of three cents for every passenger passing from one of its cars to one operated by either of the other companies. The defendant

company charged five cents for a continuous trip to a passenger over its line. One of these companies was paying 36 per cent. of its gross receipts into the treasury of the city. A petition was presented by the Buffalo Railway Company to the common council for authority to make a traffic arrangement with the defendant company whereby each might use the line of the other. Various propositions were made to the council by the several companies pending these negotiations, and differences arose, and the whole matter was relegated to a committee of three prominent citizens to examine into the propositions of the several companies, and resulted in a report and agreement conformably thereto, known as the "Milburn Agreement," which was entered into as of January 1, 1892. By this agreement transfer charges and double fares were abolished. A new system of percentages was adopted as a substitute for those theretofore assumed by the companies, and each agreed to pay annually 2 per cent. of its gross receipts when the same were less than $1,500,-000, 2½ per cent. when such receipts were less than $2,000,000 and over the first sum stated, and 3 per cent. when such receipts were over $2,000,000. This agreement subsequently received the sanction of the Legislature (chapter 151, p. 311, Laws 1892), and the percentages have since been paid in compliance therewith. The approving act expressly relieves the railway companies from the payment of percentages, except those provided for and reserved in and by such contract.

In 1899 (Laws 1899, p. 1593, c. 712) the Legislature enacted the special franchise tax law, which brought within the general definition of "land" or "real estate" the right, privilege, or franchise to construct or operate street surface railroads. Upon the valuation fixed by the State Board of Tax Commissioners of a franchise within a given city, the local authorities of such city levies its tax. The taxes so levied, however, are payable to the localities, and are subject to certain specific deductions prescribed in section 46 of the act, which, so far as material, reads as follows:

"If when the tax assessed on any special franchise is due and payable under the provisions of law applicable to the city, town or village in which the tangible property is located, it shall appear that the person, co-partnership, association or corporation affected has paid to such city, town or village for its exclusive use within the next preceding year, under any agreement therefor, or under any statute requiring the same, any sum based upon a percentage of gross earnings, or any other income, or any license fee, or any sum of money on account of such special franchise, granted to or possessed by such person, co-partnership, association or corporation, which payment was in the nature of a tax, all amounts so paid for the exclusive use of such city, town or village except money paid or expended for paving or repairing of pavement of any street, highway or public place, shall be deducted from any tax based on the assessment made by the State Board of Tax Commissioners for city, town or village purposes, but not otherwise; and the remainder shall be the tax on such special franchise payable for city, town or village purposes."

The act was a new contribution to our state taxing law. It put life into a privilege or license or franchise, unquestionably often of great value, and brought it within the dominion of the taxgatherer as taxable property. People ex rel. Met. St. R. R. Co. v. Tax Coms., 174 N. Y.

417, 67 N. E. 69; Kronsbein v. City of Rochester, 76 App. Div. 494–499, 78 N. Y. Supp. 813, et seq.  It placed the power of determining the valuation in a state board, but required this valuation to be spread upon the local assessment roll by the assessors.  In order to avoid any double payment of taxes to the localities, it provided for deduction of moneys paid to them pursuant to statute or agreement, of "any sum based upon a percentage of gross earnings, or any other income, or any license fee or any sum of money on account of such special franchise," providing only that such payment partake of the characteristics of a tax.  The municipalities were already benefiting from the use of the streets by railroads by reason of sums paid into their treasuries and applied toward the expenses of the municipalities, thus ameliorating the tax burden which would otherwise be borne by other property owners.  To the extent of these payments, in so far as they were in the nature of a tax, they were to be allowed to the person or company assessed for a special franchise.  The Legislature evidently had in mind existing conditions, and legislated with reference to them.  While putting a new class of property upon the assessment roll, it still appreciated that by certain statutes the right of the sovereign power in the streets had been transmitted to the localities; that accompanying the delegation of the power was the authority to dispose of the street franchise for defined purposes and in a specific manner, to the end that the public was to be benefited by the operation of street railroads, and the local body politic by an annual enhancement of its revenues, which indirectly was tantamount to or partook of the nature of a tax. "A tax is a forced contribution from a citizen to the state to be applied to governmental purposes."  Davies, System of Taxation, p. 1.  It is the involuntary proportional payment by a property owner toward the expenses of the municipality or state.  The tax is imposed without his consent.  A payment "in the nature of a tax" must in its general aspects partake of these characteristics.

The original statute (chapter 252, p. 312, Laws 1884, § 8) fixing the percentages, and requiring their payment into the treasury "to the credit of the sinking fund," levied the amount which the corporation operating the railroad in the streets of a city must contribute.  The corporation paying had no voice in fixing the sum to be paid.  It was an annually recurring charge which savored of a tax.  It was fixed by statute, and was an exaction of money upon the earning capacity of the property, and the defendant contributed it toward the expenses of the municipality.  We think these percentages were clearly within the exemption prescribed by section 46.  Chapter 65, p. 81, of the Laws of 1886, and the subsequent amendments, are each entitled, "An act to secure adequate compensation for the right to construct street railroads in cities."  Each act in terms provides for a sale to the highest bidder, so the element of compensation does enter into the transaction; but the defendant, in order to operate its railroad in the streets of Buffalo, was obliged to acquire the right in the manner prescribed by the statute.  While it was a free bidder in the sense that it was not required to bid, yet, if it constructed its railroad at all, it must pay an annual charge to the city for so doing.  To that extent the payment was a "forced contribution."  Again, the purchase price

for the license to use the streets could not be paid in a gross sum. Beekman v. Third Ave. R. R. Co., 153 N. Y. 144–158, 47 N. E. 277. It must be by annual payments, and graded by the receipts or earning power of the company. These payments went into the city treasury, where all money of the city must be paid (Charter of the City of Buffalo, §§ 59, 64, c. 105, pp. 146, 147, Laws 1891) and applied to reduce tax levies.

The fact that the money paid is remuneration for something acquired is not incompatible with the proposition that it also may be "in the nature of a tax." So far as it is the purchase price, denuded of any of the other attributes which the statute imports into it, we may say it is not in the nature of a tax. When, however, we come to consider that the payments must be made to enable the defendant to do business, that it must be paid in yearly percentages of its revenues, and goes to swell the annual budget of the city, we conclude that it has the indicia of a tax, even though it be also a compensation for property acquired. The tax which a stock corporation pays for the privilege of doing business is based upon its capital stock, and is the compensation which it pays for that privilege. It has the attribute of a tax, as well as that of compensation. Whatever may be the condition ·imposed for the privilege of doing business, whether designated a bonus, compensation, a license fee, or in name a tax, it is in effect a tax. Burroughs on Taxation, § 131; Gordon v. The Appeal Tax Court, 3 How. (U. S.) 133, 11 L. Ed. 529; Home Ins. Co. v. New York State, 134 U. S. 594, 10 Sup. Ct. 593, 33 L. Ed. 1025; Chicago General Railway Co. v. City of Chicago, 176 Ill. 253, 52 N. E. 880, 68 Am. St. Rep. 188.

The imposition of a percentage charge for the privilege of doing business has been treated as the levying of a tax contribution. In Maine v. Grand Trunk Railway Company, 142 U. S. 217, 12 Sup. Ct. 121, 35 L. Ed. 994, the state of Maine had imposed upon railroad companies what it denominated "an annual excise tax for the privilege of exercising its franchises in this state." The tax was based upon the "gross transportation receipts," and was in lieu of all other taxes. The court, in commenting upon the authority to make this exaction, say at page 228, 142 U. S., page 122, 12 Sup. Ct., 35 L. Ed. 994:

"It [the state] may require the payment into its treasury, each year, of a specific sum, or may apportion the amount exacted according to the value of the business permitted, as disclosed by its gain or receipts of the present or past years. The character of the tax or its validity is not determined by the mode adopted in fixing its amount for any specific period or the time of its payment. The whole field of inquiry into the extent of revenue from sources at the command of the corporation is open to the consideration of the state in determining what may be justly exacted for the privilege. The rule of apportioning the charge to the receipts of the business would seem to be eminently reasonable, and likely to produce the most satisfactory results both to the state and the corporation taxed."

.It is of no significance to say that in the case cited this is designated a "tax." The essence of the charge is that it was an annual impost which the railroad company was called upon to pay in the way of percentages for the privilege of doing business. That is the chaacteristic feature of every percentage imposition. Judge Cooley,

in his Constitutional Limitations (6th Ed.), at page 611, uses this language:

"Every burden which the state imposes upon its citizens with a view to revenue either for itself or for any of the municipal governments, or for the support of the governmental machinery in any of the political divisions, is levied under the power of taxation, whether under the name of tax or under some other designation.   *   *   *   It is not uncommon, as we have already stated, to require that corporations shall pay a certain sum, annually assessed, according to the amount or value of their capital stock, or some other standard; this mode being regarded by the state as most convenient and suitable for the taxation of said organization."

Nor do we think the Milburn agreement so changed the relations of the defendant toward the city in its payment of the percentages which it provided for as to affect the question under consideration. The report of the committee is pervaded with the understanding that the agreement which it recommended was to be a substitute for the existing relations of the companies and the city. This same understanding is embodied in the agreement itself. One sentence, which is in harmony with the whole text of the agreement, reads:

"The intention of the parties is to substitute for the percentages of their gross receipts agreed to be paid as aforesaid by the Crosstown and West Side companies the percentages herein fixed of the gross receipts of all three companies, and thereby insure the operation of the entire system of street railroads without any preference of any part thereof over any other part."

When we turn to the language itself of section 46, considered in conjunction with existing conditions, we find it expressive of an intent to allow deductions of this kind. The payment is to be abated if paid to the city: (1) "Under any agreement therefor." Since 1892 the authority for the payments has been the Milburn agreement. (2) "Under any statute requiring the same." The original warrant of authority was the mandate of the Legislature, and the agreement itself has been ratified by that body. (3) "Any sum based upon a percentage of gross earnings, or any other income." The foundation of these payments is by percentages upon gross earnings. The Legislature, however, in its care to avoid any burden savoring of a double tax, extended the deduction to be made to a percentage upon any income. (4) "Or any license fee." It may be, as suggested in the brief of the counsel for the appellants, that some companies paid certain fees for the use of cars, and hence this exemption. The franchise granted is of the character of a license, and this expression is used interchangeably with "consent" in chapter 642, p. 919, Laws 1886. (5) "Or any sum of money on account of such special franchise." Following the specific enumerations of the various payments on account of which deductions are to be made is this omnium gatherum clause, indicating the breadth of purpose of the Legislature to include within the category every conceivable payment of the general quality to which the section relates. The payment must, however, have been "in the nature of a tax." Not generically or sub nomine a tax, but embodying the characteristics which inhere in every tax payment. The language of the whole section is designedly comprehensive to cover every possible payment for

a street franchise accruing to a city and which partakes of the characteristics of a tax. As already suggested, the crucial attributes of a tax are that it is a toll upon property without the consent of the owner, and the money secured is to be applied toward governmental expenses of the body politic for whose benefit the imposition is to be made. These two characteristics are manifestly paramount in the percentage payments which the defendant has made to the city as well under the statutes as the Milburn agreement.

The various acts delegating to the municipality the right to dispose of the privilege of using the streets for the operation of street railroads contained, as one of the chief constituents, the furnishing of a revenue to the city. In Beekman v. Third Ave. R. R. Co., supra, after reciting succinctly the fact that the statute requires the franchise to be sold to the bidder agreeing to pay the largest yearly percentage, the court add, at page 153, 153 N. Y., page 279, 47 N. E.: "The purpose evidently was to secure to the city the largest revenues that could be consistent with the public convenience and the public interest." With these revenues accruing in fact, based upon percentages or agreements inuring to the monetary benefit of the city, the Legislature passed the special franchise tax law as another revenue producer to the city. The act is akin to the previous legislation in that it imposed a burden upon the privilege of constructing or operating railroads in the streets. In the previous acts the payment of revenues to the city must have been upon the assumption that the right possessed value and earning power—the usual concomitants of property. In the franchise tax law it was made taxable property by fiat of the Legislature, and was classified as real estate, and directed to be placed upon the assessment roll like other taxable property. The mandate of the Legislature did not create this property; it merely required it to be placed upon the assessment roll. It took property then contributing to the revenues of the city, and comprehensively provided a system for its assessment. It, however, was careful to provide for giving credit to the property owner for payments made to the treasury of the city. When we consider the course of this legislation relative to the gradual growth of the sentiment that a street franchise is property amenable in some way to taxation, and culminating in the special franchise tax law, the meaning of the language allowing for deductions must lead to the conclusion that it embraces the percentage payments made by the defendant. Language so carefully chosen, and so obviously with reference to existing situations, was not used by accident. It should receive a fairly liberal construction, and the intention of the Legislature followed as far as it can be ascertained.

It is a matter of current history that the act was passed at an extraordinary session of the Legislature convened for the sole purpose of reconsidering a similar effort which had been passed at a regular session but had not received the approval of Gov. Roosevelt. In the message convening the Legislature, the Governor expressly advised amending the proposed legislation by allowing for deductions by reason of percentages on the gross earnings of the companies

86 N.Y.S.—15

about to be taxed. The Legislature gave heed to this suggestion and passed the act, with section 46 in the way it now appears. While not in any sense conclusive upon the legislative intent, yet, taken in connection with the trend of the entire legislation upon the subject, it tends to clarify the legislative purpose, if any elucidation were necessary.

The counsel for the respondent contends that the Milburn agreement is founded on a good consideration, and that the payments of the percentages pursuant thereto were voluntarily made, and accordingly were not in any sense a tax. The essence of every agreement is a good consideration, and that it expresses the engagement of the contracting parties freely assumed. Yet section 46 in terms allows deductions "made under an agreement therefor," implying that, even though the percentages may be paid conformably to an agreement, they may still be in the nature of a tax. In all the acts providing for a sale of the consent of the local authorities for the use of the street privilege, an agreement was essential. The unique language, "in the nature of a tax," was probably adopted so that it could not be claimed that, because the payments made may not have contained all the attributes of a tax, still they would come within the purview of the exemption allowed.

The important distinction to be kept in mind in this case is that the city of Buffalo had no franchises to sell except as it was derived from the sovereign power. Beekman v. Third Ave. R. R. Co., 153 N. Y. 144–152, 47 N. E. 277. The salable or merchantable value was imparted to it by the Legislature. In prescribing the limited authority to sell, the Legislature required that payment for the privilege must be by a per cent. of the earnings of the company purchasing. Subsequently the state, in the exercise of its dominant authority, and for the benefit of the localities, characterized this franchise as "taxable property." In order to obviate the payment of a double tax, it required the municipal authorities to give credit to the corporation for whatever it was already liable to contribute annually by its percentages toward the expenses of the city. Before the right to sell the consent of the municipal authorities to a street surface railroad company had been conferred, many companies had acquired the privilege gratuitously. One company enjoying the privilege was taxed a yearly sum therefor, while its competitor suffered no diminution of its earnings for that license. One was paying a large rate, another a minimum percentage. The system of deductions was designed in a measure to equalize this disparity. If any company had paid a gross sum for the franchise, it was not practical to carry the process of equalization to an allowance or return of any part of the purchase price so paid. The Legislature, realizing that payments by percentages were generally prevalent throughout the state, and for years had been the one system permissible, adopted the only feasible method of adjusting the inequalities which had grown out of the legislation on the subject. To equalize the tax burden is the pith of any tax law. Cooley's Constitutional Limitations (6th Ed.) p. 607.

Very naturally, much ingenuity has been manifested to discover what deductions were intended by section 46, unless the interpretation

here given is to prevail. The proposition is confidently asserted that it is entirely consistent to hold the Legislature intended that a lamp tax, license fees, and taxes for the maintenance of the police and health departments were intended to be covered by this language providing for percentage deductions. The lamp tax of the city of Buffalo is levied pursuant to section 414, c. 105, p. 224, of the Laws of 1891, which is the city charter. One half of this charge is payable out of the general fund. The other half is apportioned upon the taxable property of the taxing district, and goes upon the assessment roll in a separate column headed "Lamp Tax." There is no provision in the franchise tax law permitting the deduction of this tax. The taxes for the support of the city departments are in name, as well as in fact, taxes. The license fee is specifically enumerated in section 46. Not one of these tax items is a payment by percentages, either by virtue of any agreement or pursuant to any statute. The peculiar language of the section pertinent to the system of percentages prevailing can hardly be tortured into referring to taxes pure and simple and which are directly levied. The Legislature did not reconvene, and re-enact this tax law with this important section ingrafted in it, without a purpose. It was intended to meet and adjust and harmonize the varying conditions existing. If it was framed to allow deductions for specific taxes which are an ordinary municipal charge, a few plain words would have been all-sufficient. In fact, the only deductions allowed, so far as I am able to perceive, are those by percentages. These corporations are charged with the payment of ordinary municipal taxes upon their franchises, the same as any other taxpayer of the city upon his assessable property.

A few other objections may be noted. It is insisted that the Legislature did not intend to grant the right to the municipality to sell the franchise, and then after its exercise take away the benefits of the sale. This is hardly a judicial statement of the action of the Legislature. It did permit a sale to be made for the benefit of the city, the revenues to be paid in a certain way. It then extended the benefits accruing to the city by the special franchise tax law, imposing as a condition that the lesser benefits delegated be surrendered or merged in the greater. It is also claimed that when the Milburn agreement was entered into the defendant might as well have agreed to pay 5 or 7 per cent. of its earnings as the lesser rate, if all are to be deducted from the tax now charged. Along the same line much is said as to the sale to the highest bidder being unnecessary if the whole percentage imposed is to be deducted. The fallacy of this position must be apparent when we consider that the Milburn agreement and all the other statutes imposing percentages were in force long prior to the enactment of the franchise tax law, and the Legislature could not forecast the passage of that act. That law simply took hold of the situation then existing. Nor is the franchise property of the city of the same character as tangible property which it may own. Its title, coming from the sovereign power, is for a special restricted purpose, and not the unqualified ownership usually attaching to property.

The record before us does not show that the "great street surface railroad corporations in the cities of New York and Brooklyn pay

percentages" amounting annually to many thousands of dollars." We may assume, however, that the statement is correct. It is fair also to indulge the correlative proposition that each of these corporations is called upon to pay a far greater sum into the coffers of the city by reason of increased taxes laid upon it pursuant to the special franchise tax law.

Again, it is stated that by chapter 616, p. 1349, Laws 1900 (Rapid Transit Act), passed since the special franchise tax law, a large percentage is imposed. By that act the city of New York is authorized to issue bonds to provide moneys for the construction of the road. The rental and 1 per cent. percentage on the amount of the bonds are to be applied toward the payment of the interest on these bonds, and the balance to go into a sinking fund for the purpose of meeting this obligation. The act itself fixes the status of these percentage payments, and they do not become a part of the general city fund at all, and are probably not within the compass of section 46. Therein lies the clear distinction between percentages paid for general purposes and those for a specific purpose, which arises solely by reason of the expenditures created by the act requiring their payment. In the one general taxation is lightened by the payments, and in the other no such benefit accrues. It is also to be noted that the act of 1900 does not regulate this percentage upon the income or revenue of the company, but upon certain bonds issued by the city, and which it is expected the railroads or construction company will pay as an obligation against it. From our view of this section it is unnecessary for us to enter into a discussion of the grammatical construction of its language, as has been done by the counsel for the appellants. Suffice it to say that we do not concur with the analysis made. The payment referred to, we think, unmistakably relates back to the predicate of the sentence, and includes every sum to be deducted. As was said by the Court of Appeals in People ex rel. Met. Street R. R. Co. v. Tax Com'rs, 174 N. Y., at page 438, 67 N. E. 73:

"It is commanded that all sums, in the nature of a tax, paid by the owner of a special franchise to a municipality for its exclusive use, should be deducted from the tax imposed for local purposes."

The valuation of the franchise of the defendant made by the State Board of Tax Commissioners, and the statement thereof filed with the city clerk, was in a gross sum. It was placed upon the annual assessment roll of the Twentieth Ward of the city as an indivisible sum. The principal office of the defendant was in that ward. The contention of the appellants is that the assessment was void because not divided or apportioned among the various wards or tax districts of the city. We find nothing in section 42 of the tax law requiring this apportionment to be made. The tax receipts are payable to the city treasurer, and the deductions are a gross sum which by the statute imposing them are to be paid to the city treasurer. This is further confirmed by the Milburn agreement, which provides that the gross receipts or percentages are "to be deemed an indivisible sum." The assessors of the city are elected on the general tickets, and comprise the board for the entire city (sections 129–136, City Charter; Laws

1891, pp. 161, 162, c. 105), and that constitutes their tax district. The Tax Law (chapter 908, p. 796, Laws 1896, § 2) defines a tax district as follows:

"'Tax district' as used in this chapter, means a political subdivision of the state having a board of assessors authorized to assess property therein for state and county taxes."

Section 42 of the Special Franchise Law (Laws 1899, p. 1590, c. 712) requires the clerk to deliver a certified copy of the statement filed with him "to the assessors charged with the duty of making local assessments in each tax district of said city." He was therefore required to deliver a copy of the statement to the board of assessors and to no one else, and this was the authority for the assessors to spread the assessment upon the roll.

Nor do we subscribe to the contention of the appellants that the imposition of the tax for the benefit of the city by the special franchise law is violative of the Milburn agreement. By the statutes in force at the time of the making of that agreement, the defendant was obliged to pay certain sums to the city by way of percentages. The burden which it undertook by virtue of that agreement was in substitution of the percentages imposed by statute. There is nothing in the agreement indicating an intention to relieve the defendant from any tax which the Legislature might impress upon its property.

We think the court erred in not allowing to be applied, in reduction of its tax levied under the special franchise tax law, the said sum which it had paid into the city treasury for percentages accruing to the city in pursuance of the Milburn agreement. For that error the judgment should be reversed, and a new trial granted, with costs to the appellants to abide the event.

Judgment reversed, and new trial ordered on questions of law only, the facts having been examined and no error found therein, with costs to the appellants to abide the event.

WILLIAMS and STOVER, JJ., concur.

McLENNAN, P. J. (dissenting). The material facts of this case are not in dispute, but are such as to make it necessary to determine the true meaning of section 46 of the Franchise Tax Law (chapter 712, p. 1593, of Laws 1899).

I concur in the conclusion reached by the majority of the court upon the questions presented by this appeal, except as to the meaning of and the effect which should be given to the section of the statute referred to, which involves the question: Is a street surface railroad corporation, organized under the laws of this state, entitled to be credited upon the tax assessed against it in any year under the franchise tax law with the amount which it may have paid the previous year to the municipality in which its road is located, under and by virtue of the bid which it made or the agreement which it entered into as a condition of obtaining its franchise from such municipality? The majority of the court are of the opinion that the amount thus paid by the corporation should be so credited,

because such "payment was in the nature of a tax," within the meaning of section 46 of the franchise tax law. That section provides as follows:

"If, when the tax assessed on any special franchise is due and payable under the provisions of law applicable to the city, town or village in which the tangible property is located, it shall appear that the * * * corporation affected has paid to such city, town or village for its exclusive use within the next preceding year, under any agreement therefor, or under any statute requiring the same, any sum based upon a percentage of gross earnings, or any other income, or any license fee, or any sum of money on account of such special franchise, granted to or possessed by such * * * corporation, which payment was in the nature of a tax, all amounts so paid for the exclusive use of such city, town or village * * * shall be deducted from any tax based on the assessment made by the State Board of Tax Commissioners for city, town or village purposes, but not otherwise; and the remainder shall be the tax on such special franchise payable for city, town or village purposes."

The defendant Crosstown Street Railway Company of Buffalo is a street surface railroad corporation. It was organized about the month of February, 1890, under and pursuant to chapter 252, p. 309, of the Laws of 1884. Section 7 of that act provided, in substance, that the local authorities of any incorporated city or village of the state might, at their option, sell at public auction the "franchise" to construct, maintain, and operate a street surface railroad upon any street, road, avenue, or highway of such city or village. Section 8 required that, in cities having a population of 250,000 or more (which included the city of Buffalo), the corporation obtaining such franchise—

"Shall, for and during the first five years after the commencement of the operation of any portion of its railroad, annually, on the first day of November, pay into the treasury of said respective cities in which its road is located, to the credit of the sinking fund thereof, three per cent. of its gross receipts for and during the year ending the next preceding thirtieth day of September, and after the expiration of said five years, make a like annual payment into the treasury of said respective cities, for the credit of the said sinking funds, of five per cent. instead of three per cent. of said gross receipts. * * * In any other incorporated city or village the local authorities shall have the right to require, as a condition to their consent, * * * the payment annually of such percentages of gross receipts, not exceeding three per cent., into the treasury of said city or village as they may deem proper."

Under the provisions of that statute any incorporated city or village not having a population of 250,000 was authorized to sell at public auction a "franchise" for a gross sum to be paid in cash by the corporation purchasing the same, and on the same day to sell another "franchise" to a different corporation, and require it to pay annually a certain percentage of its gross yearly receipts. The two franchises might be substantially equal in value, and the purchase price or the sum bid for each might be practically the same, but in one case the purchase price was required to be paid at once and in cash, and in the other the obligation of the corporation to pay a certain percentage of its gross receipts each year during its corporate existence was accepted in payment in lieu of a gross sum. Under that act it would have been entirely competent for the city of Buffalo to have sold such franchise to a railroad corporation for a

gross cash sum, in addition to the percentages specified in the statute, and at the same time to have sold another franchise to a different corporation for a percentage of its gross receipts, in addition to the percentages of such receipts required by the statute to be paid by the purchaser of such franchise. Chapter 65, p. 81, of the Laws of 1886, imposed the obligation upon all municipalities to sell such franchise "at public auction to the bidder who will give the largest percentage per annum of the gross receipts derived from the operation of such railroad or railway, with adequate security as hereafter provided for the payment of such percentage, provided that in cities having a population of two hundred and fifty thousand or more such percentage shall in no case be less than three per centum per annum of such gross receipts, for and during the period of the first five years of the operation of any portion of said railroad or railway, and five per centum per annum of such gross receipts after the expiration of five years." That act was amended by chapter 642, p. 919, of the Laws of 1886, but its requirements were not materially changed in any respect important to note, except that its provisions did not "apply to companies now organized or hereafter to be organized for the purpose of building elevated railroads in counties having less than one million inhabitants, nor to street surface railroad companies heretofore organized in cities or villages of less than forty thousand inhabitants." The statute as amended prescribed with great detail the manner in which the sale of such franchises must be made, and how advertised, and provides: ,

"The comptroller or other chief fiscal officer of the cities, and the president of the board of trustees in villages, shall attend and conduct the sale * * * and may cancel the bid if the bidder shall not furnish satisfactory security, and sell the said consent and license in the same manner as above provided."

Chapter 65, p. 81, of the Laws of 1886, as amended by chapter 642, p. 919, of the Laws of 1886, was again amended by chapter 564, p. 756, of the Laws of 1889, but none of the provisions involved in this controversy were changed by such amendment.

In 1890 the Railroad Law was passed, being chapter 565, p. 1082, of the Laws of 1890. Section 91 (p. 1108) of that act provides that a street surface railroad shall not be built or operated upon the streets of a city until the consent of the municipal authorities is obtained. Section 93 (p. 1109) provides that the consent of the municipal authorities in cities containing 90,000 inhabitants or over must contain the provision "that the right, franchise or privilege of using any street * * * shall be sold at public auction to the bidder who will agree to give the city the largest percentage per annum of the gross receipts of such corporation, with a bond or undertaking in such form or amount and with conditions * * * for the fulfillment of such agreement. * * *" Provision is also made for giving notice of or advertising such sale.

Section 95 (p. 1111) provides:

"Every corporation building or operating a railroad, constructed or extended under the provisions of this article, or of chapter two hundred and fifty two of the laws of eighteen hundred and eighty four, within any city of this state having a population of two hundred and fifty thousand or more, shall, for and

during the first five years * * * pay into the treasury of the city in which its road is located, to the credit of the sinking fund thereof, three per cent. of its gross receipts,⁻ * * * and after the expiration of such five years * * * five per cent. of the gross receipts."

It will be seen that, as applied to the city of Buffalo, the statute of 1890 practically re-enacted chapter 65, p. 81, of the Laws of 1886, as amended, and required a franchise in that city, like the one in question, to be sold at public auction to the highest bidder, and that in that event the corporation purchasing the same was required to pay to the city the 3 and 5 per cent. (as the case might be) upon its gross receipts specified in the statute of 1886.

The whole subject of the compensation which corporations should be required to pay to municipalities for franchises of the character here involved was again considered by the Legislature in the year 1892, with the result that chapter 676, p. 1382, of the Laws of 1892, was enacted, which was an amendment of the railroad law of 1890. The law of 1890 repealed chapter 252, p. 309, of the Laws of 1884, chapter 65, p. 81, of the Laws of 1886, chapter 642, p. 919, of the Laws of 1886, and also chapter 564 of the Laws of 1889. So that the railroad law of 1890, as amended in 1892, contained the only statutory provisions relating to the compensation which was or might be required to be paid by a railroad corporation to a municipality for the right or franchise to construct and operate a railroad upon its streets or avenues. Section 90 (p. 1399) of the railroad law, as amended in 1892, provides:

"A corporation organized since May 6, 1884 [the defendant railway company was organized in 1890], for the purpose of building and operating or extending a street surface railroad * * * upon and along any street, avenue, road or highway in any city, town or village, * * * must comply with the provisions of this article."

Section 91 (p. 1399):

"Such railroad shall not be built, extended or operated unless * * * the consent of the local authorities * * * shall have been first obtained."

Section 93 (p. 1400):

"The consent of the local authorities in cities of twelve hundred and fifty thousand inhabitants * * * must contain the condition that the right, franchise and privilege * * * shall be sold at public auction to the bidder who will agree to give the largest percentage per annum of the gross receipts of such corporation, with a bond or undertaking. * * *"

It is further provided in such section as follows:

"Nothing herein contained shall be construed as applying to or affecting or modifying the terms of a certain contract bearing date January 1, 1892, entered into by and between the city of Buffalo and the various street surface railroad corporations therein, named in such contract."

Which is the Milburn agreement, and will be referred to later.

Section 95 (p. 1403) provides that every corporation building or operating such railroad, in cities having a population of 1,250,000 or more, shall pay to such city 3 or 5 per cent. of its gross receipts, as the case may be, substantially as provided by chapter 65, p. 81, of

the Laws of 1886, as amended.  The section further provides as follows:

"In any other incorporated city or village [having a population of less than one million, two hundred and fifty thousand] the local authorities shall have the right to require, as a condition to their consent to the construction, operation or extension of a railroad under the provisions of this article, the payment annually of such percentage of gross receipts, not exceeding three per cent., into the treasury of the city or village, as they may deem proper.  *  *  *"

The law of 1892 is the last enactment of the Legislature bearing upon the subject.  We have now called attention to the various statutes relating to the authority of municipalities to sell the right, franchise, or privilege to construct and operate street surface railroads upon the streets and avenues of such municipalities from the year 1884, when chapter 252, p. 309, of the Laws of 1884, under which the defendant railway company was organized, to the present time, and it will be observed that, while there have been numerous changes in the law, few of them have affected the city of Buffalo, and none of the appellant railway company.

To recapitulate:  Under the act of 1884 the city of Buffalo might, at its option, sell at public auction the franchise, but, whether or not it was so sold, the corporation obtaining the same was required to pay annually therefor 3 or 5 per cent. (as the case might be) of its gross receipts to the treasury of such city for the credit of the sinking fund.  By chapter 65, p. 81, of the Laws of 1886, as amended by chapter 642, p. 919, of the Laws of 1886, it was made mandatory upon the city of Buffalo to sell the franchise at public auction to the highest bidder, and the corporation bidding the same was required to pay the percentage fixed by the act of 1884, in addition to the amount of its bid.  The railroad law, being chapter 565, p. 1082, of the Laws of 1890, did not affect the city of Buffalo or a corporation obtaining a franchise to construct and operate a railroad upon the streets of that city.  Under section 95 of the railroad law, as amended in 1892, the city of Buffalo still had the right to require, as a condition of granting a franchise, "the payment annually of such percentage of gross receipts, not exceeding three per cent., into the treasury of the city  *  *  *  as they may deem proper"; but besides, as we have seen, it was expressly provided by that section that none of the provisions of the article should affect the obligation assumed by the appellant railway company under the contract which it entered into with the city of Buffalo, known as the "Milburn Agreement."

In this connection it may be observed that the Legislature, ever since the year 1884, after as well as before the passage of the franchise tax law (1899), required or authorized the municipalities of the state, including the city of Buffalo, to sell a franchise to the highest bidder, a corporation bidding the highest percentage of its gross annual receipts therefor; and in no event, at the option of said municipality, to be less than 3 per cent. of such gross receipts.  In other words, there has been no time since the passage of the act in 1884, under which the appellant railway company was incorporated,

when it could not have been required to pay at least 3 per cent. of its gross annual receipts for the franchise granted to it.

Prior to the month of February, 1890, the appellant railway company, under and pursuant to chapter 65, p. 81, of the Laws of 1886, as amended, made application to the city of Buffalo for a franchise to construct, maintain, and operate a street surface railroad upon certain streets and avenues in said city. All the provisions required by statute having been complied with, on or about the 6th day of February, 1890, the city of Buffalo sold such franchise at public auction to appellant railway company, at its bid of 11¾ per cent. of its gross annual receipts, payable annually, in addition to the 3 or 5 per cent. required to be paid under section 65, p. 81, of the Laws of 1886, as amended. The appellant railway company being the highest bidder, such franchise was struck off or sold to it at the price bid, and such railway company thereupon executed to the city of Buffalo a bond or undertaking in the penal sum of $200,000, conditioned for the payment by it of the percentages bid by it, and for the faithful performance of other conditions imposed upon it by the purchase of such franchise. Immediately thereafter the appellant railway company, having executed the undertaking required, which was duly approved by the city, entered upon the construction of its railroad, completed it, and has ever since been engaged in operating the same.

Before and after the defendant railway company had obtained the franchise from the city of Buffalo to construct and operate its railroad in certain streets of said city in the manner above indicated, other corporations, to wit, the West Side Street Railway Company and the Buffalo Street Railway Company, had obtained franchises from said city, authorizing them respectively to construct and operate their railroads upon other streets of said city. The Buffalo Railway Company was under no obligation to pay anything to said city of Buffalo for its franchise, and had a right to charge a transfer fare of three cents for each passenger transferred from the cars of one of its lines to those of another. The appellant railway company charges a full fare of five cents for each passenger riding over any of its lines, whether transferred or not to another line. The West Side Street Railway Company had agreed, upon the purchase of its franchise, to pay 36¹/₁₀ per cent. of its gross receipts in consideration of the franchise granted to it. Other conditions existed which authorized said companies to exercise such rights or privileges as to render the street surface railroad service of the city of Buffalo unsatisfactory. Thereupon the said three corporations, to wit, the appellant railway company, the Buffalo Railway Company, and the West Side Street Railway Company, entered into negotiations with the city of Buffalo looking to a readjustment of the percentages which they had respectively agreed to pay, and a modification of their rights and privileges. Such negotiations resulted in an agreement by which all transfer charges or double fares were abolished, and certain other things specified in said agreement by said companies were to be done and performed which were regarded as beneficial to the city of Buffalo and its inhabitants. In consideration of the covenants and agreements on the part of such railway com-

panies, the city of Buffalo consented that they should be relieved from paying the percentages which they had respectively agreed to pay, and from certain other obligations which they had assumed, and in lieu thereof it was agreed (so far as is important to note) that such companies should pay annually to the city of Buffalo 2½ per cent. of their gross receipts, for the payment of the total amount of which each of said companies became jointly and severally liable.   Such agreement, which is called the "Milburn Agreement" in the record, was ratified by act of the Legislature, being chapter 151, p 311, of the Laws of 1892, and thereupon, concededly, became binding upon all the parties to it.   Under said agreement the appellant railway company became liable to pay to the city of Buffalo, for the year ending June 30, 1900, $13,480.45, being 2½ per cent. of its gross receipts for that year; and it actually paid into the city treasury that sum.

Under the franchise tax law (chapter 712, p. 1593, Laws 1899) the State Board of Tax Commissioners determined the value of the special franchise of the appellant railway company to be $2,455,735, for the purposes of taxation for the fiscal year 1900–01.   Certiorari proceedings were instituted by the appellant, and resulted in a determination that its franchise was only of the value of $1,719,014, and it was finally adjudged to be that amount   Upon such valuation there was duly assessed against the appellant railway company, as and for its franchise tax payable to the city of Buffalo, the sum of $29,463.33. There was added to that sum $1,854.70 as a lamp tax, imposed under the provisions of title 19, c. 105, p. 224, Laws 1891, being the charter of the city of Buffalo, as amended; so that the total amount of the tax imposed upon the appellant railway company payable to the city of Buffalo, upon the valuation of its franchise, was $31,318.03.   Before the commencement of this action the appellant railway company tendered to the city of Buffalo that amount, less the sum of $13,480.45, which it had paid pursuant to the terms of the Milburn agreement, to wit, the sum of $17,837.58.   The city of Buffalo refused to accept such sum in payment of the franchise tax assessed against the appellant railway company.   Thereupon this action was brought to recover the amount.   The judgment appealed from decreed that the city was entitled to recover the full amount of such franchise tax, together with the percentages imposed by the statute because of the nonpayment of the same when due, and determined that the appellant railway company was not entitled to offset, as against such sum, the $13,480.45 which it had paid the previous year under the Milburn agreement   In other words, it was held that the $13,480.45 so paid was not in the nature of a tax, and therefore that the appellant railway company was not entitled to be credited with that amount upon its franchise tax.

Thus the question is squarely presented whether or not the appellant railway company is entitled to credit for the sum which it paid, pursuant to its agreement, for the purchase of the franchise obtained by it, as against the amount assessed against it under the franchise tax law, upon the ground that the percentage of its gross receipts which it agreed to pay upon the purchase of such franchise "was in the nature of a tax."   It must be admitted that the $13,480.45 paid by the appellant railway company, under and pursuant to the terms of the Mil-

burn agreement, was in lieu of the amount which said company had obligated itself to pay upon the purchase of the franchise in question. It seems to me that the amount so agreed to be paid was in no sense a tax or "in the nature of a tax," but that it was the purchase price of the franchise obtained from the city of Buffalo. Such a franchise is property (People v. O'Brien, 111 N. Y. 1, 18 N. E. 692, 2 L. R. A. 255, 7 Am. St. Rep. 684), and by the express provision of the franchise tax law is made real property; so that, by the provisions of chapter 65, p. 81, of the Laws of 1886, as amended, the city of Buffalo was authorized to sell "property" to the corporation bidding the highest price therefor, and it was charged with the duty of seeing to it that it obtained therefor the largest possible price. The appellant railway company, upon the sale of such property, was the highest bidder. It agreed, in consideration of the sale to it of such property, to pay annually a certain per cent. of its gross receipts. The bid made by it was voluntary. Others were bidding in competition, all seeking to obtain the thing offered for sale at the lowest price.

Under certain statutes the Legislature authorized the city of Buffalo to sell a franchise. Under other statutes or the common law it had the right to sell other property which it owned or possessed. The purchase price of either represented the value of the thing sold, and had none of the characteristics of a tax. If the city of Buffalo is the owner of and has the right to sell a plot of ground, and sells it at public auction, can it be said that the sum bid for it—the purchase price— is "in the nature of a tax"? The city of Buffalo was authorized—and not only authorized, but required—to sell at public auction its consent to construct and operate a railroad upon certain of its streets. Such consent was advertised, and was offered for sale, in accordance with the provisions of the statute. Upon such sale the appellant railway company bid a certain percentage of its gross earnings for the consent thus offered. The amount which it bid was the purchase price of the thing sold, and was in no sense a tax or "in the nature of a tax," but was the purchase price, pure and simple, of the property which the appellant railway company obtained. The circumstance that the price bid was based upon gross receipts, or was to be determined in some other way, rather than a gross sum, cannot change the character of the transaction. In either event it was the purchase price.

Independent of the general proposition, it is proper to ascertain, if possible, the legislative intent in enacting the statute in question. Notwithstanding the language, if it clearly appears that the Legislature intended to relieve street surface railroad companies from paying to municipalities the amount which they agreed to pay when they obtained their respective franchises, in case the amount was based upon gross receipts, by crediting the same upon the tax imposed upon their respective franchises under chapter 712, p. 1593, of the Laws of 1899, then such corporation should be credited with the amounts so paid by them. We think, however, that such was not the intent of the Legislature, and that a contrary intention is clearly manifested. In the first place, it is hardly conceivable that the Legislature intended to relieve a corporation from the payment of the amount which it agreed to pay for its franchise, if such amount

was based upon percentages of its gross receipts in any previous year, and that a corporation which had paid a gross sum in cash in the same year for a like franchise should have no relief or credit. Again, it would seem to be unreasonable that the Legislature should have required a municipality to sell a "franchise" at public auction to the highest bidder, impose upon it the duty of obtaining the highest price possible therefor, and then enact that the purchase price should in any event be credited to the purchaser upon a tax subsequently imposed by statute. In the case at bar the city of Buffalo presumably obtained for the franchise sold to the appellant railway company the best possible price, as it was required to do under the statute, which was 2½ per cent. of its gross annual receipts; but, according to the appellant railway company's contention, the city would have been quite as well off if it had sold the franchise for $1, payable annually, instead of $13,480.45, because in one case there would have to be deducted from the franchise tax only $1, and in the other the sum of $13,480.45. In other words, if the contention of the appellant is to prevail, it was entirely immaterial to the municipality whether the franchise sold for little or much, so long as the purchase price was less than the amount of the franchise tax.

In the case at bar, as we have seen, the appellant railway company obligated itself, under the Milburn agreement, to pay 2½ per cent. of its gross receipts annually to the city of Buffalo. As appears by the record, that percentage was agreed upon after much negotiation, and after the municipality had done its best to obtain a larger amount, and the appellant railway company had used its best efforts to make the percentage as small as possible. Yet, if the contention of the appellant is to prevail, there need have been no controversy between the contracting parties as to the amount of the percentages. The appellant railway company might just as well have agreed to pay 5 or 7 per cent. of its gross receipts, because the full amount of such percentages would have been credited upon the tax imposed by the franchise tax law. If such is the construction, meaning, and intent of section 46 of the Franchise Tax Law (Laws 1899, p. 1593, c. 712), why should a corporation bidding for a franchise haggle about the amount of the percentages to be paid by it if the amount of such percentages is in any event to be credited upon its franchise tax?

Attention has been called in the prevailing opinion to a message of the Governor to the Legislature, prior to the passage of the act of 1899, indicating that it was his thought that the purchase price of franchises, if payable in percentages upon receipts, should be deducted from the franchise tax; but in that connection it is important to note that the Legislature has continued to impose upon certain municipalities the duty of selling such franchises at public auction to the highest bidder. Under the statute of 1890 any city having a population of 1,250,000 or more must sell at public auction, to the corporation bidding the greatest percentage of its gross receipts, a franchise authorizing such corporation to construct, maintain, and operate a railroad upon the streets or avenues of such city. The sum so bid must be paid into the treasury of such city for its

purposes. Did the Legislature intend that the sum so required to be paid should be deducted from the tax imposed upon such corporation by the franchise tax law, or credited to it upon such tax? If so, as we have seen, it is unimportant what the amount of the bid is, because, whether little or much, it is to be deducted from the franchise tax assessed against such corporation. Under the law as it stood when the appellant railway company obtained its franchise, it was competent for the local authorities of any of the cities or villages of the state, not having a population of 250,000, to sell a franchise for a gross sum payable in cash. The city of Buffalo was required by the statute to sell such franchise for a percentage upon the gross receipts of the corporation purchasing the same. Was it the intent of the Legislature that, in other cities than those having a population equal to the city of Buffalo, the corporations which bought such franchises and paid cash therefor should not have relief, or be entitled to any credit, because of the amount so bid by them, and that the corporations purchasing such franchises in cities having a population of 250,000 or more, and agreeing to pay a certain percentage of their gross annual receipts therefor, should be entitled to be reimbursed annually for the total percentage or amount so agreed to be paid by them? We think such was not the legislative intent when it passed the Franchise Tax Law (chapter 712, p. 1593, Laws 1899).

The provisions of the franchise tax law are entirely harmonized, and the course of the Legislature relating to the sale of franchises by municipalities is entirely consistent, unless it is determined that the purchase price of such franchises is "in the nature of a tax." It may be inquired, what was the purpose of the language used in the statute? No better answer could be made than to say that the "lamp tax" imposed by the charter of the city of Buffalo is covered by it. In some cities a license fee had been imposed upon each car of a street surface railroad, and various other taxes or license fees were imposed upon such corporations, some of them as police, and others as health, requirements. Concededly all such taxes—license fees, or what not—should be deducted from the tax imposed by the franchise tax law, but we fail to see why or how the purchase price of a franchise should be so deducted. It seems to me a farce to require a municipality to sell a franchise at public auction, charge it with the duty of obtaining the highest possible price therefor, if it, in fact, is to make no difference to such municipality whether the price paid is little or much. Under the law of 1892 the great street surface railroad corporations in the cities of New York and Brooklyn were required to pay a certain percentage of the gross annual receipts to the cities in which their respective railroads are located, amounting annually to many thousands of dollars. I think it was not the intention of the Legislature, when it passed the franchise tax law, to practically relieve such railroad corporations from the payment of the percentages which they agreed to pay to such municipalities upon obtaining their respective franchises. Under the Rapid Transit Act (chapter 616, p. 1349, Laws 1900), passed the year following the passage of the franchise tax law, corporations organized under that act were required to pay a very large percentage of their earnings

to the municipalities in which their railroads were severally located. If the section of the statute in question is to bear the construction given it by the prevailing opinion, then such corporations are entitled to have such percentages credited upon their franchise taxes. We do not·believe that such was the legislative intent.  Prior to the passage of the franchise tax law the property of the defendant railway company (and like corporations) was presumably assessed at its full value.  In making such assessment, not only the value of its rails, cars, buildings, and lands was taken into consideration, but also its earning capacity   The assessment was supposed to represent the value of the railroad, as such, and upon such valuation the defendant paid taxes, and, in addition, it paid annually to the municipality the amount which it bid upon securing its franchise.  The valuation of the defendant's railroad, as assessed under the franchise tax law, might not be materially increased, and yet, if appellant's contention is to prevail, such corporation might be substantially relieved from taxation, because credited with the amount which it agreed to pay annually to the city for the use of certain ot its streets.  If such is the necessary result of the act, it might properly be denominated an act for the relief of certain street railroad companies which had agreed to pay a considerable percentage of their gross earnings to the municipality from which they obtained the right to operate their respective railroads.

The question involved in this appeal is important, and the effect of the decision will be far-reaching.  If the decision about to be announced is correct, practically every street surface railroad in the state will be relieved from the payment of any and all sums which they have agred to pay to the municipalities for their franchises, provided such amount does not exceed the special franchise tax.  We cannot assent to the proposition that it was the intent of the Legislature, in passing the franchise tax law, to cancel all such obligations.  The effect of the decision, as announced by the majority of the court, is that the purchase price, the amount bid by any corporation, for any franchise, if less than or only equal to the tax assessed against such corporation, must be deducted therefrom, because, and solely upon the ground that, such purchase price is "in the nature of a tax."  We cannot assent to such an interpretation of the law, for the reason that, as it seems to us, it is unjust and inequitable, and, further, that it is not warranted by the plain reading of the statute, because there is no basis for the claim that the amount voluntarily bid and agreed to be paid for a franchise, for property, for the right to use the streets of a municipality, is a tax, or "in the nature of a tax."

The lamp tax, amounting to $1,854.70, was a tax within the meaning of the statute referred to, and the judgment appealed from should be modified by deducting therefrom that sum, and, as so modified, it should be affirmed with costs.

HISCOCK, J., concurs.