Eder, J.
Several owners of property included in a school site selected by the board of estimate have brought a taxpayers’ action against all the members of the board, the budget director, and the City of New York, demanding that the resolution authorizing condemnation of said site be rescinded and the condemnation enjoined. Defendants’ motion to dismiss pursuant to rule 106 of the Rules of Civil Practice on the grounds of legal insufficiency and lack of jurisdiction of the subject of the action was denied by Mr. Justice Hecht (3 Misc 2d 227). He held, in effect, that since the complaint charged defendants with bad faith it must be deemed sufficient. Defendants served notice of appeal therefrom but plaintiffs then proceeded to amend their complaint as of course to add an additional charge of illegality in the purported use of the condemned property for private as well as public use.
Defendants have now moved to dismiss the amended complaint pursuant to rules 106 and 112 (defendants having served their answer) and for summary judgment pursuant to rule 113.
Concerning the branch of the motion directed to rules 106 and 112: The amended complaint took the place of the original complaint, thus rendering academic the appeal previously taken (Millard v. Delaware, Laclcawanna & Western R. R., 204 App. Div. 80). To preserve defendants’ right to appeal on this branch of the motion it is accordingly necessary to determine the legal sufficiency of the amended complaint. The prior order under these circumstances is not controlling as “the law of the case ” even though the amended complaint is the same as the original except for some additional allegations. However, I also deem the amended complaint sufficient as a matter of pleading when considered in light of its basic charge of bad faith, as pointed out by Mr. Justice Hecht and later discussed. On this motion defendants do not seriously press the pleading motions but, as indicated require a decision de novo. The motions to dismiss based upon rules 106 and 112 are accordingly denied.
This motion has really been brought for summary judgment dismissing the complaint. Since the action is not one of the nine actions enumerated in the first part of rule 113, defendants must show that their “defense is founded upon facts festablished prima facie by documentary evidence or official record the complaint may then be dismissed unless plaintiffs show facts sufficient to raise an issue with respect to their verity and conclusiveness. "Where the documents establish that a plaintiff has no cause of action, dismissal will follow even though defendant has interposed a general denial only (Levine v. Behn, 282 N. Y. 120). Affidavits may be used by the moving defendant *32 to supplement or explain the documentary evidence but cannot be an independent source for granting the motion.
The documents being public records of public bodies and officials, plaintiffs have not disputed their verity (except in a minor detail). They have, however, disputed their conclusiveness. Indeed, their case rests entirely on alleged inferences which they draw from those very records. They do not come forward with any independent proof, and it is clear they do not have any, of the bad faith and conspiracy with which they charge defendants. They simply argue that they are entitled to a trial at which the credibility of the defendants may be tested.
In considering the documentary exhibits to determine whether any such inference as claimed by plaintiffs may be drawn therefrom, it is necessary to keep clearly in mind the principles laid down by the authorities for this type of action and the specific charge of this complaint.
A taxpayer’s action under the statute can be given effect “ by confining it to a case where the acts complained of are without power, or where corruption, fraud or bad faith, amounting to fraud, is charged ” (Talcott v. City of Buffalo, 125 N. Y. 280, 288). In that action, however, where plaintiff sought to restrain defendant from changing its lighting system, the complaint was dismissed, the court observing that evils “ due to mistakes, errors of judgment or the lack of intelligent appreciation of official duty ’ ’ cannot be corrected by legal action but only by the public changing such elected or appointed officials and substituting others in their place.
Plaintiffs rely upon Adamson v. Union R. R. Co. (74 Hun 3). Its facts bring it clearly within the rule of special liability laid down in the Talcott case. A committee of the common council of the City of Brooklyn recommended that a certain valuable right be given to defendant railway company which had offered nothing, suppressing in its report any mention of an offer to pay $30,000 therefor by another company with equal facilities. The court said: “ Plainly it was a case of malfeasance, and judged by the motives which actuate men the inference is easily drawn that the action was collusive. If the object was not to favor the defendant corporation the act is inexplicable ” (p. 9).
In Adamson v. Nassau Electric R. R. Co. (89 Hun 261, 264) the court said of Adamson v. Union R. R. Co., (supra): “ That case may stand as an authority for the interference of the courts with municipal affairs upon the precise facts there existing, but if it is to be deemed an authority that the courts may, in a taxpayer’s action, restrain the execution of ordinances and laws passed by municipal authorities in matters committed by *33 the Constitution of the State to their judgment and discretion, it is in conflict with well-settled principles of law The court reversed a judgment where the trial court found that franchises were granted for a less sum than was offered by others and could be obtained, this being viewed as bad faith under the Union R. R. Co., case. The appellate court pointed out that there was no legal requirement to accept the highest bidder and also no allegation or proof that the alderman who granted the franchises were corrupt, and dismissed the complaint. In the absence of a showing of corruption their choice was deemed a legislative act within their judgment and discretion and free from interference by the judicial branch of the Government.
The act here complained of is the selection of a school site. All parties agree that the statutory plan provides for recommendations by the board of education of alternate sites to the board of estimate which may select one or reject all, in which event further recommendations are required to be made by the board of education. The latter board is not a party to this action (see Schnepel v. Board of Educ. of City of Rochester, 302 N. Y. 94).
The plaintiffs allege that the members of the board of estimate conspired among themselves and with others to authorize the acquisition of site No. 6 (in which their property is included) by a scheme whereby a more suitable site was ‘ ‘ obscured, camouflaged and suppressed from official consideration ” in order to create artificially an ostensible reason for rejecting the more suitable site, for the purpose of favoring the owners of said property and of property adjacent thereto (who opposed its selection). They specifically allege that this nearby vacant lot, sufficient in itself and satisfying all reasonable conditions, was through said conspiracy of defendants not considered on its own merits, but, as a result of the deliberate addition thereto of encumbered adjoining property, was rendered vulnerable to attack and ultimate rejection. In other words, that defendants fraudulently arranged to have the board of education submit the proposed site in such distorted form so as to make rejection easy. The amended complaint charges defendants “ limited and usurped the free choice by the Board of Education of sites for said schools ”.
This is the crux of the case and it alone is the basis upon which Mr. Justice Hecht upheld the complaint as a pleading. He said: “ If plaintiffs should prove that the defendants, acting in concert, among themselves and with others, in bad faith contrived to have the submitted sites so arranged that the tax lot, allegedly sufficient of itself, was not so submitted, but was submitted only as part of a site including unnecessary adjacent *34 parcels, which rendered the site unsuitable, all to the advantage of the owner of the tax lot in question and to the disadvantage of the city, then a cause has been stated. That is the basic problem. ”
We now turn to the proof of this charge, which plaintiffs , maintain is contained in the documents presented on this motion. These consist of the Journal of Proceedings of the Board of Estimate on December 16, 1954 (and the transcript of public hearing held that day) and on January 27, 1955 (and transcript of public hearing that day) when final selection of site No. 6 was made; official records of the board of education; and official reports to the Mayor and to the budget director. Affidavits identifying and explaining these exhibits are submitted by the associate superintendent of schools in charge of the division of housing; ,the senior civil engineer of the budget bureau in charge of all budgetary matters relating to the selection of school sites and construction; and the director of real estate of the city.
It appears therefrom that the project of building a new high school of industrial arts to replace the outmoded and inadequate quarters of that school has been pending for over 12 years. The capital budget of the city carried such item since 1942 but no report was advanced to the board of estimate until December, 1954, because of lack of funds. During the intervening years the board of education submitted various proposed alternate sites, and considered many others which it rejected as unsuitable for the special conditions as to location, transportation, etc. required for this type of school. Suggestions were received by it from many sources including parents’ associations; from the city planning commission at the instance of Commissioner Robert Moses (suggesting in March, 1954, a joint high 'school and community playground facility) and from representatives of the budget bureau, with whom consultations were frequently had to effect economics in the building of new schools.
It is conclusively shown by these exhibits that the property including ‘ ‘ the nearby vacant lot ’ ’ was suggested to the associate superintendent on July 27, 1954, by two members of the board of education, and that it was his office which prepared the details as to what property should be included in the. proposed site. The resolution of the board of education dated August 26, 1954, states the dimensions of this additional alternate site known as No. 5 (which is the exact size claimed by plaintiffs to be a deliberate distortion planned by defendants) and requests the board of estimate to select one of the five alternate sites submitted. These records establish that defend *35 ants had nothing whatsoever to do with the submission of site No. 5 nor with the form in which submitted.
Plaintiffs have offered nothing to controvert the conclusiveness of this proof that defendants did not contrive to arrange the site in question so as to suppress and camouflage the vacant lot. They have thus failed to meet the “ basic problem No possible cause of action against defendants remains. The subsequent events help to round out the picture and confirm the view that the conspiracy charge is wholly unfounded.
Site No. 6 (actually selected) had originally been suggested to the budget director in June, 1952, in tentative form by the senior engineer of the budget bureau as representing a saving because part of the proposed site included an old elementary school which would soon have to be demolished, in addition to other factors such as central location. When the board of education’s resolution of August, 1954, came to the budget bureau for report, the senior engineer drew up an interoffice report which set forth the advantages and disadvantages of each of the alternate sites submitted, noting also that protests had been filed by associations, tenants, etc. with regard to practically all of the sites. It then stated, as to site No. 5, that owners of part of the property had advised of actual making of plans and surveys and receipt of permits for building three apartment houses costing $10,000,000 (thus increasing the estimated cost of acquiring it in condemnation) and that the owner of an $8,000,000 apartment house opposite the site was opposed to a vocational high school at this location. He then suggested in more final form site No. 6. The budget director forwarded this suggestion to the board of education, and that board noted in its resolution of November 18, 1954, that “ as a result of recent conferences with the office of the Budget Director another alternate sité ” was considered and is submitted to the board of estimate. Surely, holding conferences and accepting suggestions after due consideration cannot be deemed surrender of the board’s function to submit sites.
This resolution of November 18, 1954, was referred by the board of estimate to the city planning commission, the budget director and the director of real estate. The commission reviewed the various pertinent factors; found site No. 5 “not as conveniently located ” as others, and observed that most of the land had been acquired by a private developer for a large residential development; that site No. 6 would be satisfactory, being “ well located ” and “ accessible to the art centers and industries related to the proposed school The budget and real estate directors’ reports were more detailed, setting forth *36 the advantages, disadvantages, cost, protests made, as to each site. As to site No. 5, precise data was given as to the survey, plans, permit, etc., for the proposed development; the increase in the estimated cost of acquiring this site; the statement of another substantial realtor owning the development across the street as well as other land on this site that he proposed also to build a $10,000,000 housing project; the potential loss of about $500,000 tax revenue if the site were nevertheless taken; moreover, the site was “ not well located ”. Site No. 5 was not recommended. Site No. 6 was recommended with a complete specification of its advantages in location, cost, and provision for the children in the elementary school demolished as well as the high school students.
At the public hearing which followed the presentation of these reports (December 16, 1954) the speakers discussed mostly the question as to the proposed two-school building on site No. 6. Concerning site No. 5, two representatives set forth plaintiffs’ view that it was more suitable than their own property on site No. 6 — a common enough situation when one site has to be selected and the others released. A representative of the substantial realtor stated his firm’s connection with part of the property of site No. 5 and urged the board to consider the public interest ‘‘ to encourage additional housing in the immediate future and additional tax revenues to the City of New York ”, and pointed to the desirable location in Sutton Place territory of this property to justify a large housing development. Such economic factors are, of course, extremely relevent and material before condemning private property for a public use. The matter was adjourned solely to straighten out the two-school situation. As a result of conferences with parents’ associations and civic groups, this question was answered to almost everybody’s satisfaction. At the final hearing on January 27, 1955, site No. 6 was selected after some discussion pro and con, including statements of approval by the parents’ association of the elementary school being demolished and by a representative of industries in the area and the C.I.O. and the A.F. of L.
Here we do not have a picture of close secrecy, conspiratorial backdoor maneuvers, or hidden influence, such as was true in the Union R. R. Co. case (supra). These hearings open to, and participated in, by the public and these public records available to all reveal candidly and fully the reasons inducing defendants’ choice of site No. 6. The attempt to ascribe “ undue influence ” to the substantial realtor is without foundation; he presented his arguments in exactly the same manner as plaintiff’s representatives. A protest against the condemnation of a *37 proposed site is an everyday story and, indeed, is the right of every owner or tenant who believes himself seriously prejudiced by such action.
The records conclusively show that defendants after due consideration of the complex of the various interwoven factors embraced in selecting a school site, selected one of the sites submitted by the board of education. If their judgment is deemed bad, there still is no occasion for a taxpayer’s suit. It is not the judicial function to interfere unless there be a clear showing of corruption or bad faith amounting to fraud. Plaintiffs rely entirely on the inferences which, they say, are warranted by these records. The only inference possible is that defendants had nothing to do with the inclusion of other property with the vacant lot in site No. 5 and that they exercised their judgment of final selection on the basis of complete reports and after public hearing with no suggestion or even hint of any bad faith. To justify plaintiffs’ position we would have to include the city planning commission and the board of education as coconspirators. Moreover, no reason is suggested, and none, it seems to me, can be given, why, if defendants did not want this vacant lot to be among the sites submitted, it should have ever been offered as a possible site, even as part of site No. 5. Would not the entire problem have been most easily avoided (if defendants were conspirators and in control of the board of education’s submission function) by simply not submitting that block at all, or any part of it, as an alternate site?
There is one final item to be disposed of. The amended complaint charges illegality in the fact that it is intended to use the air space over the proposed school for a private use, viz. office or apartment-house structure. The short answer to this is that there has merely been some talk about it, an exploratory report by the director of real estate pointing out its advantages, and a newspaper story about it. No binding legal action has been taken. When that occurs, there will be time enough to raise any legal issue relating to a combined public and private use.
The motion for summary judgment dismissing the complaint is accordingly granted. Settle order.